UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**OMNIPOINT COMMUNICATIONS, INC.,
OMNIPOINT NY MTA LICENSE, LLC,
and T-MOBILE LICENSE LLC,**

                   Plaintiffs,

                   -against-

**THE TOWN OF RAMAPO,** THE TOWN OF
RAMAPO PLANNING BOARD, PLANNING
BOARD CHAIRMAN SYLVAIN KLEIN,
BRACHA GOBIOFF, BRENDEL LOGAN, REV.
WALTER BRIGHTMAN, JR., JOHN BRUNSON,
RICHARD STONE, DORA GREENE, in their
official capacities, constituting the Town Planning
Board, THE TOWN OF RAMAPO TOWN
BOARD and LIBORIO DERARIO in his official
capacity as Director of Building Administration and
Code Enforcement,

                   Defendants.

**08 CV. 2419 (SCR)**
ECF CASE

---

**Plaintiffs' Memorandum of Law in Support
of Motion for
Summary Judgment**

**SNYDER & SNYDER, LLP**
Robert D. Gaudioso (RG 3829)
94 White Plains Road
Tarrytown, NY 10591
914.333.0700

Dated: August 14, 2008

## Table of Contents

Table of Authorities ................................................................................ i

Preliminary Statement............................................................................ 1

Facts ...................................................................................................... 2

The Telecommunications Act of 1996.................................................... 7

Arguments

    I.     THE UNREASONABLE DELAY BY DEFENDANTS
           VIOLATES THE FEDERAL
           TELECOMMUNICATIONS ACT OF 1996......................................... 8

    II.    DEFENDANTS VIOLATED THE FEDERAL
           TELECOMMUNICATIONS ACT OF 1996 BY
           FAILING TO PREPARE A WRITTEN DECISION
           ARTICULATING THE REASONS FOR THE DENIAL
           OF PLAINTIFF'S LAND USE APPLICATION................................... 11

    III.   DEFENDANT PLANNING BOARD'S DENIAL OF
           THE APPLICATION WAS NOT BASED ON
           SUBSTANTIAL EVIDENCE CONTAINED IN THE
           WRITTEN RECORD ....................................................................... 12

    IV.   THE UNSUBSTANTIATED DENIAL OF PLAINTIFF'S
           APPLICATION WAS ARBITRARY AND CAPRICIOUS
           AND VIOLATIVE OF NEW YORK LAW .......................................... 15

    V.    DEFENDANT PLANNING BOARD'S DENIAL OF THE
           APPLICATION PROHIBITS PLAINTIFF FROM
           PROVIDING SERVICE IN THE TOWN IN VIOLATION
           OF THE FEDERAL TELECOMMUNICATIONS ACT
           OF 1996 ........................................................................................ 18

    VI.   PLANTIFF HAS MET THE STANDARD FOR
           SUMMARY JUDGMENT ................................................................. 20

         A.    The Summary Judgment Standard ............................................... 20

         B.    Generalized Objections Are Not Substantial Evidence................ 22

         C.    There Was No Sustained Or Legitimate Public
             Opposition to the Facility.......................................................... 23

Conclusion ........................................................................................... 25

## Table of Authorities

**CASES**

300 Gramatan Ave. Assoc. v. State Div. of Human Rights, 379 N.E.2d 1183 (1978)..... 16

Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)........................................................ 20

Amaker v. Foley, 274 F.3d 677 (2d Cir. 2001).............................................................. 21

Am. Textile Mfr. Inst., Inc. v. Donovan, 452 U.S. 490 (1981). ..................................... 14

Asma v. Curcione, 298 N.Y.S.2d 286 (N.Y. App. Div. 1969) ....................................... 16

AT&T Wireless Services of Fla., Inc. v. Orange County,
    982 F. Supp. 856 (M.D. Fla. 1997)..................................................................... 13-14

BellSouth Mobility, Inc. v. Gwinnett County, 944 F. Supp. 923 (N.D. Ga. 1996) .......... 13

Bockis v. Kayser, 491 N.Y.S.2d 438 (N.Y. App. Div. 1983)........................................... 16

Cellco P'ship v. Town Planning and Zoning Comm'n of Farmington,
    3 F. Supp. 2d 178 (D. Conn.1998)........................................................................ 8, 12

Cellular One v. Rosenberg, 82 N.Y.2d 364 (1993)..........................................................17

Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490 (2d Cir. 1999) .............7, 13, 22

Celotex Corp. v. Catrett, 477 U.S. 317 (1986). ............................................................ 21

Chipollini v. Spencer Gifts, Inc., 814 F.2d 893 (3d Cir. 1987)......................................21

Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568 (2d Cir.1993). ................. 21

Donahue v. Windsor Locks Bd. of Fire Commn'rs, 834 F.2d 54 (2d Cir. 1987).............. 21

Falco Realty, Inc. v. Town of Poughkeepsie Planning Bd.,
    No. 15456/05, 2006 WL 250523 (N.Y. Sup. Ct., Westchester Co., 2006)................22

Illinois RSA No. 3, Inc. v. County of Peoria, 963 F. Supp. 732 (C.D. Ill. 1997)............. 11

In re Consolidated Edison, 43 N.Y.2d 598 (1978)...........................................................17

In re Field Delivery Serv., 66 N.Y.2d (N.Y. 1985)...........................................................18

In re North Shore Steak House v. Bd. of Appeals of Inc. Vill. of Thomaston,
    30 N.Y.2d 238 (1972)............................................................................................17

James L. Garrett Co. v. Guldenschuh, 373 N.Y.S.2d 238 (N.Y. App. Div. 1975)........... 16

Knight v. Amelkin, 503 N.E.2d 106 (N.Y. 1986)...............................................................18

Knight v. U. S. Fire Ins. Co.,
    804 F.2d 9 (2d Cir. 1986), cert. denied, 480 U.S. 932, (1987). ..................................... 21

Lucas v. Planning Bd. of Town of LaGrange, 7 F. Supp. 2d 310 (S.D.N.Y. 1998). ....... 8-9

Margaritis v. Zoning Bd. of Appeals of Inc. Vill. of Flower Hill,
    821 N.Y.S.2d 611 (N.Y. App. Div. 2006)...............................................................16

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ....................... 21

Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals,
    297 F.3d 14, 21 (1st Cir. 2002)............................................................................... 14

Nextel Commc'ns of the Mid-Atlantic v. Town of Wayland,
    231 F. Supp. 2d 396 (D. Mass 2002) ...................................................................... 14

Nextel of N.Y., Inc. v. City of Mount Vernon,
    99 Civ. 10575 (CM) (S.D.N.Y. Nov. 1999).................................................9-10, 22-23

Nextel Partners, Inc. v. Town of Amherst, 251 F. Supp. 2d 1187 (S.D.N.Y. 2003) ........ 18

Omnipoint Commc'ns, Inc. v. City of White Plains, 430 F.3d 529 (2d Cir. 2005) ....23-24

Omnipoint Commc'ns, Inc. v. Common Council of the City of Peekskill,
    202 F. Supp. 2d 210 (S.D.N.Y. 2002)...................................................................... 13

i

Omnipoint Commc'ns, Inc. v. Vill. of Tarrytown Planning Bd.,
  302 F. Supp. 2d 205 (S.D.N.Y. 2004)…………………………………………….19, 22
PDH Props., LLC v. Planning Bd. of the Town of Milton,
  748 N.Y.S.2d 193 (N.Y. App. Div. 2002) .................................................... 16
Reno v. ACLU, 521 U.S. 844 (1997) ................................................................ 7
SBA Commc'ns, Inc. v. Zoning Comm'n of the Town of Brookfield,
  112 F. Supp. 2d 233 (D. Conn. 2000) .......................................................... 13
Schad v. Borough of Mount Ephraim, 452 U.S. 61 (1981) ............................... 13
Sprint v. Cestone, 00 Civ. 4828 (S.D.N.Y. Jan. 25, 2001)………………………..25
Sprint Spectrum, L.P. v. Town of Easton, 982 F. Supp. 47 (D. Mass. 1997)............... 9, 12
Sprint Spectrum, L.P. v. Town of Farmington, 1997 WL 631104 (D. Conn. 1997)……...9
Sprint Spectrum, L.P. v. Vill. of Tarrytown,
  02 Civ. 6446 (CM) (S.D.N.Y. Sept. 12, 2002)…………………………………….9
Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630 (2d Cir. 1999)…………………..8, 16, 19
Twin County Recycling Corp. v. Yevoli, 688 N.E.2d 501 (1997) ..................... 16
United States v. Diebold, Inc., 369 U.S. 654 (1962) ........................................ 21
Universal Camera v. NLRB, 340 U.S. 474 (1951)...................................... 14, 22
Western PCS II Corp. v. Extraterritorial Zoning Auth. of Santa Fe,
  957 F. Supp. 1230 (D. N.M. 1997) .............................................................. 11

## STATUTES

47 U.S.C. § 151.......................................................................................... 3, 12
47 U.S.C. § 332(c).....................................................7-8, 10-12, 18, 24
Fed. R. Civ. P. 56(c). ...................................................................................... 20
N.Y. C.P.L.R. § 7803(3) and (4) (McKinney 2006)................................... 15, 18
N.Y. Environ. Conserv. Law, §§ 8-0101 to 8-0117 (McKinney 2006)………………...6
Telecommunications Act of 1996, Pub. L. 104-104…………………………………….7
Town of Ramapo, N.Y., Code, § 376 (2004)…………………………..……………*passim*

## LEGISLATIVE MATERIALS

142 Cong. Rec. H1161…………………………………………………………..…8

## TREATISES

11 James Wm. Moore et al., Moore's Federal Practice, ¶ 56.11[1][a] (Matthew Bender 3d
  ed. 1997). ................................................................................................... 20

## Preliminary Statement

Plaintiffs, Omnipoint Communications, Inc., Omnipoint NY MTA License, LLC, and T-Mobile License LLC (collectively referred to as the "plaintiff"), submit this Memorandum of Law in support of its motion for summary judgment on the First Cause of Action set forth in the First Amended Complaint, and the First, Second, Third and Fourth Causes of Action set forth in the First Supplemental Complaint. The First Amended Complaint in this action alleges that defendants acted contrary to the Federal Telecommunications Act of 1996 ("TCA") by unreasonably delaying, for more than 22 months, plaintiff's application ("Application") for the installation of a federally licensed personal wireless services facility. The First Supplemental Complaint in this action alleges that the defendant Town of Ramapo Planning Board's ("Planning Board") eventual denial of the Application violates the TCA and the law of the State of New York.

The denial challenged herein is fundamentally flawed because it was not in writing, contains no findings of fact and no citations to evidence. Moreover, there is no evidence, let alone substantial evidence, contained in the written record, to support a denial of the Application. Rather, the Planning Board's denial of the Application was illegally based on unfounded fears of radio frequency ("RF") emissions and generalized community opposition. The record evidence submitted by plaintiff is unchallenged and is supported by (i) defendant Planning Board's own consultants, (ii) the findings of the Town of Ramapo Zoning Board of Appeals ("Zoning Board") in granting the necessary variances, and (iii) the findings and the conclusions of the Planning Board itself in adopting a negative declaration pursuant to the New York State Environmental Quality

1

Review Act ("SEQRA").  Plaintiff seeks an Order directing defendants to immediately issue all permits and approvals required to construct the proposed Facility.

<u>Facts</u>

On April 17, 2006, plaintiff filed an application with defendant Planning Board seeking a special use permit and site development plan approval, to construct a 120-foot tall federally licensed personal wireless services facility ("Facility") consisting of a monopole at an existing public utility gas substation site ("Public Utility Site"). (R., Ex. 7 at pages 00035-00146A).[1] During the course of a more than 22 month review process, plaintiff agreed to lower the height of the Facility to 100 feet to comply with the height requirements of the Town of Ramapo Zoning Code ("Zoning Code"), and to disguise the tower to resemble a tree as requested by the Town. (R., Ex. 18 at pages 00171 and 00193A; R., Ex. 44 at pages 00331-335; R., Ex. 45 at pages 00336-338 and 00358A). After an almost two year review process, including an exhaustive review of alternative sites, the adoption of a negative declaration by the Planning Board finding no significant adverse environmental impacts, and the granting of variances by the Zoning Board, the Planning Board denied the Application based on the unsupported generalized statement of one Planning Board member that the Facility is a "health risk", an "eyesore" and will "lower property values."[2] (Gaudioso Aff. ¶ 116).

---

[1]  "R" refers to the 683 page written administrative record that the parties have stipulated as being complete and accurate (the "Record"). The Court is respectfully referred to the August 14, 2008 Affidavit of Robert D. Gaudioso, attorney for plaintiff, which describes in detail how the documents which comprise the Record were developed ("Gaudioso Aff.").

[2]  The Record does not contain a written decision denying the Application and a written decision was not filed with the Town Clerk within five (5) days of when it was rendered in accordance with New York State Town Law § 274-b(6). However, on May 28, 2008,

2

Plaintiff is licensed by the Federal Communications Commission ("FCC") to provide personal wireless services within the Town of Ramapo ("Town"), a defendant in this action. (R., Ex. 7G(5) at page 00132). The licenses authorizing plaintiff to provide wireless service in the Town were issued by the FCC pursuant to 47 U.S.C. § 151. Section 151 establishes a national policy to "make available, so far as possible, to all people of the United States, without discrimination . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, [and] for the purpose of promoting safety of life and property through the use of wire and radio communications." 47 U.S.C. § 151.

The Application indicates that plaintiff is a public utility of the State of New York for zoning purposes, and that plaintiff seeks to provide personal wireless services to local businesses, public safety entities, and the general public. (R., Ex. 7G at pages 00057-59).  To provide public utility services and advance the national policies enumerated under 47 U.S.C. § 151, plaintiff must create and maintain a network of "cell sites," each of which consists of antennas and related equipment designed to seamlessly send and receive radio signals. Where there is a gap in coverage, customers living or working in or traveling through these "coverage gaps" experience inadequate service, including static, inability to place calls and mid-call disconnection.  (R., Ex. 7G(1) at page 00066; R., Ex. 24B at page 00214). The Facility would close a significant gap in

---

plaintiff received in the mail a document purportedly being a written decision from the Planning Board. This document does not appear to have been filed with the Town Clerk as required by law, does not contain any findings of fact or citations to evidence and is not part of the administrative record stipulated to by the parties in this action.

3

wireless coverage that continues to exist in the Town. (R., Ex. 7G(1) at pages 00065-76; R., Ex. 24B at pages 00213-226; and R., Ex. 45F at page 00347–358).

The evidence submitted by plaintiff in support of its permit to construct the Facility consists of the technical information required under Section 376-1214 of the Zoning Code entitled "Wireless Communication Services Facilities," including: (i) a detailed report with calculations documenting that RF emissions from the Facility would be far below federal exposure guidelines (R., Ex. 7G(3) at pages 00095-114); (ii) technical expert affidavits and reports documenting that "there is a significant gap in coverage" which the Facility would remedy (R., Ex. 7G(1) at pages 00065-76; R., Ex. 24B at pages 00213-226; R., Ex. 45F at page 00347–358); (iii) alternative siting analyses in the form of expert reports describing other sites, as well as an alternative technology known as "DAS", that were considered and determined to not remedy the significant gap in coverage (R., Ex. 7G(1) at pages 00065-76; R., Ex. 18C at pages 00192-193; R., Ex. 24B at pages 00213-226; R., Ex. 30B at pages 00237-245; R., Ex. 32D at pages 00274-305; R., Ex. 45F at pages 00347-358; R., Ex. 56 at pages 00371-373; R., Ex. 70C at pages 00463-466); (iv) computerized visual renderings illustrating the design of the Facility before plaintiff agreed to reduce the height and design the Facility to resemble a tree (R., Ex. 7G(2) at pages 00077-94); (v) a comparative sales analysis prepared by a licensed real estate appraiser which concluded that the Facility will not result in the diminution of property values (R., Ex. 63B at pages 00413-426); and (vi) a complete and detailed site plan signed and sealed by a New York State Licensed Professional Engineer demonstrating that the design of the Facility would comply with the Zoning Code and the variances granted by the Zoning Board.  (R., Ex. 45G at page 00358-A).

4

The Record also contains the following **documents from persons representing the defendants**, which support the Facility. There is a June 5, 2006 memorandum from the Town's Planning Consultant, John Lange, F. P. Clark Associates Inc. ("Town Planner"), which confirms that: (1) the Facility "is reasonably separated from the surrounding residences"; (2) the visual "impacts to the sites depicted are not severe"; and (3) "the physical impact of the proposed action will be negligible as the wireless equipment will be located on an existing utility site." (R., Ex. 16 at pages 00160-167). The Record contains an October 13, 2006 memorandum from the Town Planner that confirms that plaintiff "provided sufficient information on alternative locations to support their contention that the proposed site is one that meets their coverage requirements with the least impact upon the environment." (R., Ex. 36 at pages 00309-310). The Record also contains a June 27, 2007 memorandum from the Town Planner which advises the Planning Board that "[s]ince the Zoning Board of Appeals has granted the variances required, and since the height of the tower has been reduced to the maximum allowable height and since all of the other concerns have been mitigated, this is ready for final site plan approval." (R., Ex. 50 at pages 00363-364). The Record contains a report from RCC, the Town's RF engineering consultant that concludes "that an outdoor DAS solution for the Town of Ramapo is an impractical and unfeasible solution for the application under consideration." (R., Ex, 77 at 00558-578). The Record includes an April 12, 2007 decision from the Zoning Board which granted the necessary setback variances finding, inter alia, that: (1) "an undesirable change will not be produced in the character of the neighborhood nor a detriment to nearby properties will be created by the granting of the area variances"; and (2) "the proposed variance will not have an

5

adverse effect or impact on the physical or environmental conditions in the neighborhood or district." (R. Ex. 44 at pages 00331-335).

Certainly, the most compelling document in support of the Facility is the negative declaration prepared by the defendant Planning Board acting as Lead Agency pursuant to the New York State Environmental Quality Review Act. N.Y. Environ. Conserv. Law, Article 8 (McKinney 2006). (R., Ex. 37 at pages 00311-312).

The negative declaration adopted by the Planning Board concludes that the Facility "will not have a significant adverse impact on the environment [.]" (R., Ex. 37 at pages 00311-312). This conclusion is based on the Planning Board's findings that: (i) "the applicant has selected a site that is a current utility site which is well screened from the surrounding neighborhood"; (ii) "the visual analysis shows that the location will be minimally noticed during the leaf on seasons"; (iii) "the evergreen antenna will help mitigate visual impacts for leaf off times"; (iv) "this site provides the best option for closing the coverage gap"; and (v) "no other location could provide the coverage required with the exception of the existing O&R towers number 1 and 4, but each would have required altering the towers to increase their height to one hundred seventy five feet, one hundred feet higher than their current level, an impractical solution." (R., Ex. 37 at pages 00311-312). The Planning Board's findings in favor of the Facility are not refuted in the Record.

Despite the voluminous documentation supporting the Facility, on March 11, 2008 the Planning Board voted to deny plaintiff's Application for a permit to construct the Facility. (R., Ex. 83 at page 00674; Gaudioso Aff. ¶116). The denial of the Application was not in writing (supra note 2), was devoid of any findings of fact, and

contained no citations to evidence in the Record. (R., Ex. 83 at page 00674; Gaudioso Aff. ¶116). The Planning Board denial was clearly in response to strident community opposition based primarily upon unfounded fears of RF emissions.

Accordingly, plaintiff now seeks a Judgment and Order which declares that defendants' unreasonable delay and unsupported oral denial of the Application violated the Federal Telecommunications Act of 1996 and the substantive law of the State of New York.

### The Telecommunications Act of 1996

The Telecommunications Act of 1996, Pub. L. No. 104-104 (the "TCA") is "an unusually important legislative enactment," establishing a national goal of encouraging the "rapid deployment of new telecommunications technologies." Reno v. ACLU, 521 U.S. 844, 857 (1997). As the Second Circuit has observed: "The TCA was intended, in the words of the Conference Committee: to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services...by opening all telecommunications markets to competition." Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 493 (2d Cir. 1999).

Recognizing that the sweeping changes contemplated by the TCA might not come easily, federal lawmakers limited the ability of state and local governments to frustrate the goals of the TCA by enacting Section 704 of the TCA (codified at 47 U.S.C. §332[c] and hereinafter referred to as Section 332(c)). TCA Section 332(c) established the "National Wireless Telecommunications Siting Policy." This policy requires inter alia, that: "[a]ny decision by a State or local government or instrumentality thereof to

deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii) (emphasis supplied). The substantial evidence requirement "limits the state and local government's authority to deny construction of wireless telecommunications towers, and regulates how such decisions must be made." Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 637 (2d Cir. 1999).

## ARGUMENT

### Point I

#### THE UNREASONABLE DELAY BY DEFENDANTS VIOLATES THE FEDERAL TELECOMMUNICATIONS ACT OF 1996

Congress passed the TCA in part to increase availability of advanced wireless services "by placing certain limitations on local zoning board's regulation of the placement, construction, and modification of personal wireless service facilities." Cellco Partnership v. Town Planning and Zoning Commission of Town of Farmington, 3 F. Supp. 2d 178, 182 (D. Conn. 1998). TCA Section 332(c)(7)(B)(i)(II) requires local governments to act on a carrier's request for permission to place its facilities within a reasonable time. The legislative history of the TCA confirms that the requirement for timely action on zoning applications, was "quite obviously designed to break down the barriers to the development of a telecommunications infrastructure." Lucas v. Planning Bd. of Town of LaGrange, 7 F. Supp. 2d 310, 321 (S.D.N.Y. 1998). Indeed, the prohibition against unreasonable delay reflects the TCA's "antiregulatory and antibureaucratic . . . philosophy." 142 CONG. REC. H1161 (daily ed. Feb. 1, 1996) (statement of Rep. Oxley).

As this district court observed: the TCA's prohibition against unreasonable delay, "implement[s] Congress' intent 'to stop local authorities from keeping wireless providers tied up in the hearing process' through invocation of state procedures, moratoria or gimmicks." Lucas, 7 F. Supp.2d at 321-22 (emphasis added), quoting Sprint Spectrum, L.P. v. Town of Easton, 982 F. Supp. 47, 50 (D. Mass. 1997); see also Nextel of New York, Inc. v. City of Mount Vernon, 99 Civ. 10575 (CM) (S.D.N.Y. November 1999), attached hereto as Exhibit 1 (finding that summary judgment was appropriate and equitable relief justified, when the City of Mount Vernon engaged in an unreasonable delay).

This district court has gone so far as to codify a *per se* standard for determining when an unreasonable delay has occurred, holding that **"[i]ndeed, as a rule of thumb, . . . an application has been presumptively unreasonably delayed if it has not been acted on within six months of the date of filing. The presumption is rebuttable, of course, but in all the cases I have heard on this issue, no one has succeeded in rebutting it** (emphasis added)." Sprint Spectrum L.P. v. Vill. of Tarrytown, 02 Civ. 6446 (CM) (S.D.N.Y. Sep. 12, 2002) at p. 9, note 1, attached hereto as Exhibit 2. See also Sprint Spectrum, L.P. v. Town of Farmington, 1997 WL 631104 at *6 (D. Conn. 1997) (finding that a nine month hiatus was "a mere delay tactic, intended to further prevent the erection of [plaintiff's] monopole").

Defendant Planning Board failed to make a decision on the Application **for more than twenty-two months** after the Application was filed and only after plaintiff commenced this action alleging an unreasonable delay of the Application. Coupled with the twenty-two month review process was the defendant Town Board's

prior adoption of a moratorium and denial of plaintiff's application for a waiver therefrom. Once plaintiff was able to proceed with filing the Application, the unreasonable delays included a six-month period of time in which, without explanation, the Planning Board refused to place the Application on a Planning Board agenda after plaintiff obtained the necessary variances from the Zoning Board. (Gaudioso Aff. ¶¶ 61, 64, 67-70 and 80.). During the twenty-two month review process, the Planning Board required plaintiff to conduct an unending and repetitive search for alternative locations, as well as a review of an alternative technology known as DAS. (Gaudioso Aff. ¶¶ 65, 66, 72-78, 83-86, 88-90; R., Ex. 43; R., Ex. 53; R., Ex. 54; R., Ex. 55; R., Ex. 56; R., Ex. 61 at pages 00391-394, R., Ex. 64; R., Ex. 67 at pages 00433-434). Then, after seven Planning Board public hearings and five Zoning Board public hearings on the Application, the Planning Board adjourned the public hearing so that the public could retain an appraiser to attempt to refute the record evidence that the Facility will not have an adverse impact on property values. It is undisputed that the neighbors had more than ample time to retain their own appraiser during the twenty-two month review process and had not done so. (Defendants' Failure to Deny Allegation #61 of Plaintiff's First Amended Complaint in Answer).

As Judge McMahon observed in the <u>Mount Vernon</u> decision, plaintiff has repeatedly jumped over every "fence" defendants have built, only to find a new "fence" constructed in its path. It is therefore respectfully submitted that the undisputed evidence before the Court establishes a consistent pattern of unreasonable delay that violated Section 332(c) of the TCA.

10

### Point II

### DEFENDANTS VIOLATED THE FEDERAL TELECOMMUNICATIONS ACT OF 1996 BY FAILING TO PREPARE A WRITTEN DECISION ARTICULATING THE REASONS FOR THE DENIAL OF PLAINTIFF'S LAND USE APPLICATION

After a more than twenty-two (22) month review and the commencement of this action, on March 11, 2008, the Planning Board voted to deny plaintiff's Application based on the generalized unsupported statement of one Planning Board member that the Facility is a "health risk", an "eyesore" and "will lower property values." (Gaudioso Aff. ¶ 116). The administrative Record does not contain a written decision denying the Application and a written decision was not filed with the Town Clerk within five (5) days of when it was rendered in accordance with New York State Town Law § 274-b(6). (R. Ex. 1-86 at pages 00001-683; Gaudioso Aff. ¶¶ 118-119).

As a threshold issue, a decision denying an application must be in writing. 47 U.S.C. § 332(c)(7)(B)(iii). If not, the decision violates the TCA *ab initio*.

In Western PCS II Corporation v. Extraterritorial Zoning Auth. of Santa Fe, the court stressed the importance of a detailed written decision, when it held that "[t]he requirement for a written denial was obviously included to permit a reviewing court to ascertain the rationale behind a denial so that it can determine if that denial comports with the requirements of the statute." 957 F. Supp. 1230, 1236 (D. N.M. 1997). The court found that the purpose of the TCA provision requiring a written decision was frustrated by the municipality's failure to provide a written decision explaining the reasons for the challenged denial. In addition, the court in Illinois RSA No. 3, Inc. v. County of Peoria, held that "[d]ecisionmaking must make written findings and

11

conclusions so that reviewing bodies may efficiently judge those findings and conclusions against the evidence and the record." 963 F. Supp. 732, 743 (C.D. Ill. 1997).

By failing to render a written decision containing findings of fact or rationale, and by failing to point to evidence in the record to support its decision, defendant Planning Board frustrated the purposes of and violated Section 332(c)(7)(B)(iii) of the TCA.

### Point III

<u>DEFENDANT PLANNING BOARD'S DENIAL OF THE APPLICATION WAS NOT BASED ON SUBSTANTIAL EVIDENCE CONTAINED IN THE WRITTEN RECORD</u>

Contrary to Section 332(c) of the TCA, the decision to deny plaintiff's application was not supported by substantial evidence contained in the Record. <u>See</u> 47 U.S.C. § 332(c)(7)(B)(iii). When a local government denies an application for a federally licensed wireless facility, the local government bears the burden of establishing that its denial is based on substantial evidence contained in a written record. <u>Cellco P'ship v. Town Plan and Zoning Comm'n of the Town of Farmington</u>, 3 F. Supp. 2d 178, 182 (D. Conn. 1998); <u>Sprint Spectrum, L.P. v. Town of Easton</u>, 982 F. Supp. 47, 49 (D. Mass. 1997). The denial in this case contains no such support and is based on the generalized statements of a Planning Board member without any citations to evidence.   This unsupported denial frustrates the goals of the TCA and the national policies enumerated under 47 U.S.C. § 151.

The substantial evidence requirement is essential to achieving the goals of the TCA. As one court noted, it is a requirement that requires local governments to not "mask hostility to wireless communications facilities with unreasoned denials that make

only vague references to applicable legal standards. The procedural requirement of a written decision with articulated reasons based on record evidence forces local governments to rely on supportable neutral principles if they wish to deny a particular wireless installation." AT&T Wireless Services of Fla., Inc. v. Orange County, 982 F. Supp. 856, 860 (M.D. Fla. 1997).

Since the passage of the TCA, federal courts have been called upon repeatedly to decide disputes between local authorities and personal wireless service providers. Traditionally, a federal court's review of a local land use board decision is highly deferential, limited in scope to determining the constitutionality of the decision under a rational basis review standard. Oyster Bay, 166 F.3d at 493 (citing Schad v. Borough of Mount Ephraim, 452 U.S. 61, 68 (1981)). In contrast, decisions that are subject to the TCA are reviewed under the less deferential substantial evidence standard, the traditional standard used by federal courts to review agency actions. Oyster Bay, 166 F.3d at 493-494.

Although a district court generally defers to a local government decision by not substituting its judgment for that of the municipality, the court "must overturn the board's decision under the substantial evidence test if it 'cannot conscientiously find that the evidence supporting the decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.'" Omnipoint Commc'ns, Inc. v. Common Council of the City of Peekskill, 202 F. Supp. 2d 210, 221 (S.D.N.Y. 2002), citing SBA Commc'ns, Inc. v. Zoning Comm'n of the Town of Brookfield, 112 F. Supp. 2d 233, 237 (D. Conn. 2000) (quoting BellSouth Mobility, Inc. v. Gwinnett County, 944 F. Supp. 923, 928 (N.D. Ga. 1996)).

Substantial evidence has been construed to mean less than a preponderance, but more than a scintilla of evidence. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera v. NLRB, 340 U.S. 474, 477 (1951) (internal quotations omitted). The record should be viewed in its entirety; that is, evidence opposed to the defendants' view must be considered as well. Am. Textile Mfr. Inst., Inc. v. Donovan, 452 U.S. 490, 523 (1981).

The Planning Board's denial of the Application contains no explanation, elucidation or exegesis. "This ground alone is sufficient to quash the Board's decision." AT&T Wireless Services of Fla., Inc., 982 F. Supp. at 859. Similarly, a court may not uphold a challenged denial on grounds that were not present in the written decision. Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297 F.3d 14, 21 (1st Cir. 2002); Nextel Commc'ns of the Mid-Atlantic v. Town of Wayland, 231 F. Supp. 2d 396, 407 (D. Mass 2002).

The denial and the Record before this Honorable Court do not alone or in combination contain even a "scintilla of evidence," let alone substantial evidence, that would support the denial of the Application for the Facility. In fact, the Record consists almost entirely of evidence in support of the approval of the Facility, including: (i) all of the evidence submitted by plaintiff in support of its permit to construct the Facility, such as the technical information required under Section 376-1214 of the Town of Ramapo Zoning Code entitled "Wireless Communication Services Facilities" and additional information requested by the Planning Board (R., Ex. 7G(3) at pages 00095-114; R., Ex. 7G(1) at pages 00065-76; R., Ex. 24B at pages 00213-226; and R., Ex. 45F at page 00347–358; R., Ex. 7G(1) at pages 00065-76; R., Ex. 18C at pages 00192-193; R., Ex.

14

24B at pages 00213-226; R., Ex. 30B at pages 00237-245; R., Ex. 32D at pages 00274-305; R., Ex. 45F at pages 00347-358; and R., Ex. 56 at pages 00371-373; R., Ex. 70C at pages 00463-466; R., Ex. 7G(2) at pages 00077-94; R., Ex. 63B at pages 00413-426; R., Ex. 45G at page 00358-A); **(ii)** the memoranda from the Town Planner and the Town's RF Consultant in support of the Facility (R., Ex. 16 at pages 00160-167; R., Ex. 36 at pages 00309-310; R., Ex. 50 at pages 00363-364; R., Ex, 77 at 00558-578; **(iii)** the decision from the Zoning Board which granted the necessary setback variances (R. Ex. 44 at pages 00331-335); and **(iv)** the negative declaration adopted by the Planning Board (R., Ex. 37 at pages 00311-312).

Accordingly, since the Record before this Honorable Court does not contain even a "scintilla of evidence," let alone substantial evidence, that would support the denial of the special permit application for the Facility and in fact contains nothing but evidence in support of the approval of the Facility, plaintiff's motion for partial summary judgment should be granted.

**Point IV**

THE UNSUBSTANTIATED DENIAL OF PLAINTIFF'S APPLICATION WAS ARBITRARY AND CAPRICIOUS AND VIOLATIVE OF NEW YORK LAW

Plaintiff has moved for summary judgment on its supplemental state law claim arising under New York State C.P.L.R. Article 78. Article 78 affords relief from local decisions that are "affected by an error of law," are "arbitrary and capricious," or are not supported by "substantial evidence." N.Y. C.P.L.R. § 7803(3) and (4) (McKinney 2006).

It is well established that the determination of a municipal board will be set aside only on the basis of illegality, arbitrariness or an abuse of discretion. James L. Garrett Co. v. Guldenschuh, 373 N.Y.S.2d 238 (N.Y. App. Div. 1975); Bockis v. Kayser, 491 N.Y.S.2d 438 (N.Y. App. Div. 1983). To support its findings, and to be sustainable under Article 78, a local board charged with reviewing special permit applications must base a denial upon pertinent proof. Twin County Recycling Corp. v. Yevoli, 688 N.E.2d 501, 502 (1997); PDH Props., LLC v. Planning Bd. of the Town of Milton, 748 N.Y.S.2d 193 (N.Y. App. Div. 2002).

New York law is clear that a municipal board must base its decision on evidence in the record that would be sufficient to support a denial of the application. Asma v. Curcione, 298 N.Y.S.2d 286 (N.Y. App. Div. 1969). The test for "substantial evidence" in New York is essentially the same as that under the TCA. Willoth, 176 F.3d at 646. "In final analysis, substantial evidence consists of proof within the whole record of such quality and quantity as to generate conviction in and persuade a fair and detached fact finder that, from that proof as a premise, a conclusion or ultimate fact may be extracted reasonably probatively and logically." 300 Gramatan Ave. Assoc. v. State Div. of Human Rights, 379 N.E.2d 1183, 1186 (1978). Similar to federal law, New York law also requires that a board issue specific findings or reasoning to support its determination. Margaritis v. Zoning Bd. of Appeals of Inc. Vill. of Flower Hill, 821 N.Y.S.2d 611, 613 (N.Y. App. Div. 2006) (decision of zoning board overturned as arbitrary and capricious when board "failed to issue specific findings or reasons that it relied upon in making its determination").

16

Moreover, under New York State law, plaintiff qualifies as a public utility. See Cellular One v. Rosenberg, 82 N.Y.2d 364 (1993). In Rosenberg, the New York State Court of Appeals held that federally licensed wireless carriers, such as the plaintiff, provide an essential public service and are therefore public utilities in the State of New York. Public utilities are accorded favored treatment in zoning matters. Rosenberg, 82 N.Y.2d at 372 ("where the intrusion or burden on the community is minimal, the showing required by the utility should be correspondingly reduced" (quoting In re Consolidated Edison, 43 N.Y.2d 598, 611 (1978)). In addition, the Facility is permitted at the Public Utility Site by special use permit. A special permit use is permitted as of right when the applicant has demonstrated compliance with the applicable standards. See In re North Shore Steak House v. Bd. of Appeals of Inc. Vil. of Thomaston, 30 N.Y.2d 238, 243 (1972) ("[t]he inclusion of the permitted use in the ordinance is tantamount to a legislative finding that the permitted use is in harmony with the general zoning plan and will not adversely affect the neighborhood").

The Record herein contains exhaustive unrefuted evidence establishing that the Facility will comply with all applicable federal, state and local legal requirements. At the same time, the Record contains not a scintilla of evidence, let alone substantial evidence, to suggest the Facility would be harmful to the health, safety or general welfare of the community. The Planning Board's denial of the Application fails to contain any specific findings or reasoning to support the determination. Moreover the denial is contrary to the Planning Board's previous determination that the Facility will not have significant adverse impact on the environment. (R., Ex. 37 at pages 00311-312). The New York State Court of Appeals has held that "[a] decision of an administrative

17

agency which neither adheres to its own prior precedent nor indicates its reason for reaching a different result in essentially the same facts is arbitrary and capricious." Knight v. Amelkin, 503 N.E.2d 106, 106  (N.Y. 1986) (quoting In re Field Delivery Serv., 66 N.Y.2d 516, 517 (N.Y. 1985)).   The challenged denial is therefore arbitrary and capricious, not based on substantial evidence, and must be annulled pursuant to N.Y. C.P.L.R. Article 78. See Nextel Partners, Inc. v. Town of Amherst, 251 F. Supp. 2d 1187 (S.D.N.Y. 2003) (finding that the denial of a telecommunication application violated Article 78, was arbitrary and capricious, an abuse of discretion and not supported by substantial evidence when the record demonstrated the facility complied with applicable legal standards).

The denial before the Court is devoid of any rational basis and therefore, it is not based on substantial evidence as required by Article 78 of the New York State C.P.L.R. Plaintiff is therefore entitled to summary judgment on its State law claim.

### Point V

### DEFENDANT PLANNING BOARD'S DENIAL OF THE APPLICATION PROHIBITS PLAINTIFF FROM PROVIDING SERVICE IN THE TOWN IN VIOLATION OF THE FEDERAL TELECOMMUNICATIONS ACT OF 1996

The Planning Board's denial of the Application has the effect of prohibiting the provision of plaintiff's wireless services in the Town, in violation of Section 332(c)(7)(B)(i)(II) of the TCA, which provides that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof - . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  This is due to the fact

18

that the Facility represents the least intrusive means for plaintiff to remedy its significant gap in service in the vicinity of the Public Utility Site. See Willoth, 176 F.3d at 643; Omnipoint Communications, Inc. v. Vill. of Tarrytown Planning Bd., 302 F. Supp. 2d 205, 218 (S.D.N.Y. 2004). This fact is wholly supported by the Record.

First, plaintiff demonstrated with technical expert affidavits and reports that plaintiff had and continues to have "a significant gap in coverage" which the Facility would remedy. (R., Ex. 7(G)(1) at pages 00065-76; R., Ex. 24(B) at pages 00213-226; and R., Ex. 45(F) at page 00347-358). These gaps in service prohibit plaintiff from providing reliable service to its subscribers in the Town. The Record is devoid of any evidence that disputes that plaintiff has a significant gap in service.

Second, plaintiff demonstrated with technical expert affidavits and reports that there are no feasible alternatives to the Facility at the Public Utility Site to remedy plaintiff's significant gap in service. (Defendants' Failure to Deny Allegation #48 of Plaintiff's First Amended Complaint in Answer; R., Ex. 7I at pages 00065-76, 18C at pages 00192-193; and R., Ex. 24B at pages 00213-226; R., Ex. 30B at pages 00237-247; R., Ex. 32D at pages 00274-305; R., Ex. 45F at pages 00347-358; R., Ex. 56 at pages 00371-373).

Third, the Planning Board's own consultant confirmed that plaintiff "provided sufficient information on alternative locations to support their contention that the proposed site is one that meets their coverage requirements with the least impact upon the environment." (R., Ex. 36, at pages 00309-310).

Fourth, plaintiff demonstrated through both oral and written expert testimony **and the Planning Board's own consultant confirmed** that DAS, an

19

alternative technology, is not a feasible alternative to the Facility.   (R, Ex. 61 at pages 00389-394; R., Ex. 70(C) at pages 00463-466; R., Ex. 72 at pages 00480-490, 00501-506, and 00514-00517; R. Ex. 77 at page 00578).

Finally, in adopting the negative declaration, the Planning Board specifically found that the Site "provides the best option for closing the coverage gap" and "no other location could provide the coverage required . . .." (R., Ex. 37 at pages 00311-312).

Thus, by denying the Application, the Planning Board has prohibited plaintiff from providing reliable service to its customers using the least intrusive means available.

### Point VI

#### PLAINTIFF HAS MET THE STANDARD FOR SUMMARY JUDGMENT

A.    The Summary Judgment Standard

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE, ¶ 56.11[1][a] (Matthew Bender 3d ed.

1997). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. <u>Amaker v. Foley</u>, 274 F.3d 677 (2d Cir. 2001); <u>Chipollini v. Spencer Gifts, Inc.</u>, 814 F.2d 893 (3d Cir. 1987).

A court will grant summary judgment if the record shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986).   The court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movant. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962); <u>Donahue v. Windsor Locks Bd. of Fire Commn'rs</u>, 834 F.2d 54, 57 (2d Cir. 1987).

There is no genuine issue for trial where the record taken as a whole fails to provide a basis for "a rational trier of fact to find for the non-moving party." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The mere existence of disputed factual issues, where those issues are not material to the claims before the court, is not enough to defeat a motion for summary judgment. <u>Knight v. U. S. Fire Ins. Co.</u>, 804 F.2d 9, 11-12 (2d Cir. 1986), <u>cert. denied</u>, 480 U.S. 932 (1987).   The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. <u>Consarc Corp. v. Marine Midland Bank, N.A.</u>, 996 F.2d 568, 572 (2d Cir. 1993).

The burden required to succeed on a summary judgment motion may be met by demonstrating that there is a lack of evidence to support the nonmoving party's claim. <u>Celotex Corp.</u>, 477 U.S. at 325.   The Record before the Court lacks any evidence,

let alone sufficient evidence, to support the defendants' action, and therefore plaintiff's motion for summary judgment should be granted.

B.    Generalized Objections Are Not Substantial Evidence

Public opposition to the Facility was confined to a handful of residents who offered only generalized objections related to perceived adverse health impacts, property values and general non-specific aesthetic concerns. (Gaudioso Aff. ¶¶ 29, 36, 45, 82, 100).

The unsubstantiated concerns of the general public as described in the Gaudioso Affidavit do not constitute substantial evidence on which a board may base a denial. See Omnipoint v. Tarrytown, 302 F. Supp.2d at 222. As the Second Circuit noted in Oyster Bay, generalized concerns may not provide a basis for the denial of a construction permit for a federally licensed telecommunications facility, concluding that "the volume and specificity of the comments were not adequate to satisfy the requirement of the substantial evidence standard." 166 F.3d at 496; see also Falco Realty, Inc. v. Town of Poughkeepsie Planning Bd., No. 15456, 2006 WL 250523, at *7 (N.Y. Sup. Ct., Westchester Co., 2006) ("[t]he law is clear that community opposition in the form of generalized concerns is not sufficient to serve as the basis for denial, especially where the application meets all zoning requirements and there has been a finding that there will be no significant environmental impact on the surrounding area").   A few generalized concerns are not "adequate to support a conclusion." Oyster Bay, 166 F.3d at 494, citing Universal Camera, 340 U.S. at 477.   As this district court stated in Mount Vernon in granting summary judgment, "it is well settled that the speculative musings of disgruntled

22

citizens who don't like the way something is going to look or are worried about these health considerations are not evidence at all. They are not evidence and they cannot be the basis for denying the application." Mount Vernon at page 24.

C.    There Was No Sustained Or Legitimate Public Opposition to the Facility

While generalized concerns do not constitute evidence sufficient to support a denial under the TCA substantial evidence requirement, public opposition that is sustained and based on legitimate local concerns such as specific aesthetic impacts and property value impacts, may provide a basis to deny an application. In Omnipoint Commc'ns, Inc. v. City of White Plains, the Second Circuit considered a 25-page written resolution which denied a land use approval for a 150-foot wireless telecommunications facility. 430 F.3d 529, 532 (2d Cir. 2005).  The lengthy resolution in which the City carefully articulated the reasons for its denial, was based on 181 pages in the record that represented specific legitimate objections to the facility submitted by homeowners, citizens groups, a religious school, and others. Id. at 531-537.

The Record in this case bears no likeness to the record and written decision reviewed in White Plains. As an initial point of differentiation, the Planning Board in White Plains adopted a 25-page written resolution with specific references to evidence in the record to support its denial of the application. The administrative Record in this case does not contain such a written decision. Unlike the record in White Plains, where the Planning Board relied on expert testimony from a licensed architect who prepared renderings of the proposed facility demonstrating an adverse visual impact, the record in this case does not contain any specific evidence that the Facility will have an

23

adverse visual impact on the surrounding area. Most significantly, in the instant case, the defendant Planning Board adopted a negative declaration pursuant to SEQRA which concludes that the Facility "will not have a significant adverse impact on the environment [.]" (R., Ex. 37 at pages 00311-312). In support of the negative declaration, the Planning Board found that the Facility would be "well screened from the surrounding neighborhood," "minimally noticed during the leaf on seasons," and that "the evergreen antenna will help mitigate visual impacts for leaf off times." (R. Ex. 37 at pages 00311-312).

In addition, many public comments were based on the illegitimate and unfounded fears of RF emissions (Gaudioso Aff., ¶¶ 29, 36 and 45) and one of the stated bases for denying the Application was that the Facility was a "health risk." (Gaudioso Aff. ¶ 116). Section 332(c)(7)(B)(iv) of the TCA provides that: "No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions." 47 U.S.C. § 332(c)(7)(B)(iv). Thus, at least one of the three unsupported reasons given to deny the Application is in fact prohibited by federal law! Finally, in contrast to White Plains, the defendant Planning Board's technical experts here agreed with plaintiff's technical experts that alternative sites would not remedy plaintiff's significant gap in coverage. (R. Ex. 36, pages 00309-310; R., Ex. 58 at page 00375). Accordingly, since there was no sustained, non-generalized or legitimate public opposition to the Facility, the White Plains decision does not stand in opposition to plaintiff's motion for summary judgment.

24

With respect to the issue of property values, plaintiff submitted a comparative sales analysis prepared by a licensed real estate appraiser which concluded that the Facility will not result in the diminution of property values (R., Ex. 63B at pages 00413-426). A similar analysis was utilized in a prior report that this district court relied upon in reversing a zoning denial for a new tower. See Sprint v. Cestone, 00 Civ. 4828 (S.D.N.Y. January 25, 2001) attached hereto as Exhibit 3. Accordingly, the Planning Board's oral statement that the Facility will "lower property values" is not supported by the written Record.

## Conclusion

For all the foregoing reasons, plaintiff respectfully prays that its motion for summary judgment on the First Cause of Action set forth in the First Amended Complaint, and the First, Second, Third and Fourth Causes of Action set forth in the First Supplemental Complaint be granted, and that defendants be Ordered to immediately issue all permits and approvals necessary for construction of the Facility.

Respectfully submitted,

Robert Gaudioso (RG 3829)
Counsel for Plaintiff
Snyder & Snyder, LLP
94 White Plains Road
Tarrytown, NY 10591
(914) 333-0700

Dated: August 14, 2008

Z:\SSDATA\WPDATA\SS3\RDG\voicestream\Ramapo\06-615\Litigation\Summary Judgment Memo of Law - Revised1.doc

25

**Exhibit 1**

# Corrected Transcript
## 01/10/2000

**Nextel of New York, Inc.**
        **Plaintiff,**

                **V.**

**The City of Mount Vernon Planning Board, et al.,**
        **Defendants.**

9b5knexa

1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   NEXTEL OF NEW YORK, INC.,

4                  Plaintiff,

5            v.                            99 Civ. 10575

6   THE CITY OF MOUNT VERNON
    PLANNING BOARD, et al.,
7
                 Defendants.
8
    ------------------------------x
9
                                       New York, N.Y.
10                                     November 5, 1999
                                       2:40 p.m.
11
    Before:
12
                      HON. COLLEEN McMAHON,
13
                                          District Judge
14
                           APPEARANCES
15
    SNYDER & SNYDER
16       Attorneys for plaintiff
    BY:  DAVID L. SNYDER
17       ROBERT D. GAUDIOSO

18  WILSON ELSER MOSKOWITZ EDELMAN & DICKER
         Attorneys for defendants
19  BY:  VINCENT R. FONTANA

20

21

22

23

24

25

9b5knexa                                                                    2

1          THE COURT:  Thank you for accomodating me.  I had to

2     be down here for a meeting.  I didn't want to put you off

3     again.

4          We are here on Nextel of New York Inc. v. City of

5     Mount Vernon Planning Board and a number of other enterprises,

6     civil action 99 Civil 10575.

7          I don't have the appearance sheet.  Who is here for

8     Nextel?

9          MR. SNYDER:  Your Honor, good afternoon.  David

10    Snyder with the law firm of Snyder & Snyder, appearing for

11    plaintiff Nex Telecommunications of New York, with my

12    associate sitting second chair Robert Gaudioso.

13         THE COURT:  Thank you very much.  For Mount Vernon?

14         MR. FONTANA:  Vincent Fontana for Mount Vernon

15    Planning Board from Wilson Elser Moskowitz Edelman & Dicker.

16         THE COURT:  Is there some reason why this should not

17    be converted to an application for a permanent injunction?

18         MR. SNYDER:  Plaintiff would have no objection, your

19    Honor.

20         THE COURT:  Mr. Fontana, what else could you

21    conceivably put in?

22         MR. FONTANA:  Nothing, your Honor, except some brief

23    comments concerning plaintiff's reply memorandum of law.

24    Other than that, I have nothing else to add.

25         THE COURT:  So as far as I am concerned, we are going

1   to treat this as a hearing on a summary judgment motion, and

2   you will get an adjudication on the merits and you can do with

3   it what you like.

4           Mr. Snyder?

5           MR. SNYDER:  Thank you, your Honor.  Your Honor, I

6   think the facts are clear.  Nextel is a federally licensed

7   provider of wireless services.  It has established that there

8   is a gap in coverage within the City of Mount Vernon.  It

9   selected a site which would be ideally located to close that

10  gap in coverage.  Those facts are not in dispute.

11          Also not in dispute, your Honor, is the fact that the

12  proposed installation imposes no burden whatsoever on the

13  community:  No odor, dust, noise, traffic or visual impacts.

14          Your Honor, it is clear from the papers before the

15  court that the applicant has met the requirements for a

16  special permit in the zone wherein it proposes to locate.

17  Your Honor, against those facts there is nothing in the record

18  which the defendants have submitted which suggests the type of

19  injunctive relief the plaintiff has suggested would be

20  inappropriate.  We believe we have met the standard under the

21  Telecommunications Act.  Nextel has a job to do.  It has

22  subscribers to serve and an important service to provide

23  within the City of Mount Vernon.  We would like the

24  opportunity to provide that service, having met all the

25  stipulated requirements under the zoning code.  Thank you,

1   your Honor.

2        THE COURT:  Brief and to the point.  Mr. Fontana, you

3   probably have a lot more to say.

4        MR. FONTANA:  Actually, your Honor, I think the

5   position we have taken that is expressed in our papers is

6   clear enough.

7        THE COURT:  Actually, I don't understand the position

8   that you take.

9        MR. FONTANA:  Then would the court want to address

10  any particular questions?

11       THE COURT:  Let's start with your position that your

12  client hasn't really taken any action.  I think that is one of

13  the positions that you take, is that not correct?

14       MR. FONTANA:  Yes.

15       THE COURT:  Isn't that just an absolute admission of

16  liability under the Telecommunications Act for failure to act

17  promptly?

18       MR. FONTANA:  No, your Honor.

19       THE COURT:  It's been pending for six months, seven

20  months, something like that.

21       MR. FONTANA:  No, it is not a violation of the act,

22  because the reason the Planning Board has not rendered a final

23  decision to grant the permit or to deny it is because they

24  have been waiting for the plaintiff to come back with an

25  explanation as to why alternative sites other than the one

1    that they have a longterm lease on would not be appropriate.

2         THE COURT:  They have already told you that.  They

3    put in an affidavit.  In your own regulations -- forget about

4    what the legal effects of those is, you say that you want to

5    know why colocation isn't feasible.  They have told you why

6    colocation isn't feasible.  You don't have any evidence in the

7    record that colocation is feasible.  They have satisfied the

8    burden that you have imposed on them.  You have not satisfied

9    the burden, which I understand to be your burden, of

10   demonstrating that there is some alternative site available

11   that would be both better situated and would give them the

12   coverage that they need.

13        MR. FONTANA:  The only reason they have objected, as

14   I understand it, Con Edison building as was suggested by the

15   city of Mount Vernon, is that it is too tall.  I suggested

16   that you lower the antenna and come further into the building.

17        THE COURT:  Let me see if I have it straight.  The

18   objections to the Con Ed building are that it is too tall, it

19   would cause overlapping coverage, so that Nextel service will

20   be interfering with other Nextel service, to the detriment of

21   people like me who can't get their phones to work.  Right?

22   Did I get it right?

23        MR. SNYDER:  I couldn't have said it better, Judge.

24        THE COURT:  They don't want to put it on the --

25        MR. FONTANA:  They can put it further down.  They

1    don't have to put it on the roof.  There are buildings where

2    the panels could be put on the side of the buildings.  If that

3    is too tall and there are other buildings on Gramerton Avenue,

4    which was also suggested by the City of Mount Vernon Planning

5    Board, if those buildings were too short they could have put

6    an antenna on top of those buildings, and they would be in

7    commercial areas.

8           The city is not attempting to shut them down and

9    refuse to give them an opportunity to put up a facility to

10   complete the gap, if you will.  But as I read their papers,

11   even putting the -- using the site of the Con Ed building --

12   sorry, 21-29 West Sidney, that may still give them an

13   obligation to put something in the southeast portion of the

14   city.  So it is not going to solve the gap problem by using

15   West Sidney Avenue.  If that's the case, as in Mr. Woods'

16   affidavit, paragraph 12 -- I made quite a few citations to

17   portions of the record provided by the plaintiff where they

18   make the statement.  This is not going to solve the problem of

19   putting another site in the southeast portion of the city.

20          THE COURT:  What right does Mount Vernon have to hold

21   up this site against the possibility that they may have some

22   day to put up a different site?  Where in the

23   Telecommunications Act does it say that you have to do that?

24   It is quite clear that the law was passed by Congress to keep

25   you people from doing what you are doing.

1           MR. FONTANA:  It is not the city's intent to

2    deliberately delay this.  Other companies have sites in the

3    city of Mount Vernon.  They have never indicated to Nextel

4    that they are not going to let them do something to satisfy

5    the gap problem.  All the city is saying is, you, Nextel, have

6    delayed for a long time to provide to our satisfaction

7    alternative sites or the fact that there are no alternative

8    sites.

9           THE COURT:  They told you that a long time ago.

10          MR. FONTANA:  But only as to two sites, your Honor.

11          THE COURT:  It is because your rule says tell us why

12   you can't colocate.  Your rule doesn't say tell us why you

13   can't be located on any other building in Mount Vernon.

14          By the way, it is not within the purview of the

15   Planning Board of the City of Mount Vernon to say we can't put

16   these things on residential buildings, which seems to be your

17   gripe.

18          MR. FONTANA:  The preference is that they not be in

19   residential areas.  They would concede if you are in a

20   residential building but in a commercial area that would

21   satisfy their objections, but they realize that they cannot

22   prevent Nextel or any other provider from going into a

23   residential area.  We are not trying to do that.  We are

24   trying to negotiate with Nextel to reach a compromise to see

25   if there is a spot in a commercial area, whether it is a

1    residential building or not.  From the Planning Board's

2    perspective, they felt they were not given enough satisfactory

3    response to the sites that were either recommended by the

4    city, or when other sites were recommended, for example on

5    Gramerton Avenue, they were just rejected.

6              One of the reasons they seem to have been rejected

7    was the fact that, one, in the Con Edison building they

8    couldn't get a long enough lease, and secondly, they have a

9    lease on 21-29 West Sidney.  If they didn't have the lease,

10   maybe they would be more agreeable to working with the city to

11   try to find an alternative location.  If their problem is the

12   lease, then they have created the problem themselves, and if

13   they are delaying in providing information to the Planning

14   Board, it is not the Planning Board that is sitting around

15   dragging its feet.

16             THE COURT:  The way I read the record, they are not

17   delaying providing information at all.  Every time they ask,

18   you ask for something, they provide it, and then you come up

19   with something new that you want.

20             MR. FONTANA:  From the beginning, the site of

21   residential versus commercial area has always been a matter of

22   discussion.  After the Planning Board approved 531 Lincoln, it

23   was decided in the future we want you to come back to us first

24   with a commercial area, explain to us why a commercial area is

25   not suitable.  So they knew when they got permission to have a

1  cotenancy on Monopole and Lincoln, that that is the city's

2  desire.

3          As a matter of fact, from my conversations with a

4  representative of Omnipoint, that is their first choice also,

5  and that is because the city expressed to them that's their

6  preference.  That was communicated to Nextel back when 531

7  Lincoln was approved.  Remember, they did approve Nextel being

8  on 531 Lincoln.

9          So at some point we believe it is very conceivable

10  that Nextel will demonstrate to the Planning Board that there

11  is no reasonable alternative to what we want.  They know that

12  they have no choice but to say yes.

13          THE COURT:  Mr. Snyder?

14          MR. SNYDER:  Your Honor, Nextel proposed to locate in

15  a zone where the proposed use is permitted by special permit.

16  Under New York law, a special permit use is tantamount to a

17  legislative finding that the use is acceptable to the zone.

18  Nextel has met the requirements for the special permit.  It

19  constitutes a permitted use in the zone.  There is nothing in

20  the record before the court to suggest this installation would

21  have any adverse impact on the community.  We have

22  demonstrated a need for this site.  We have demonstrated that

23  the alternative sites proposed by the defendants did not

24  provide adequate coverage, and on that record we believe

25  Nextel is entitled under the Communications Act to the relief

1    it has respectfully requested from this court.

2            THE COURT:  Mr. Fontana, you said you wanted to

3    address something that was in the reply brief, which I did

4    read this morning.

5            MR. FONTANA:  On page 2 there is a reference that the

6    defendants conceded the fact that 21-29 West Sidney would

7    satisfy the gap in coverage, and I believe I said earlier that

8    is not the case.  Based on what I read in their various

9    exhibits, even using the site of 21-29 would not completely

10   solve their gap problem.  If that is true, then the short

11   delay that has been resulting from this application would not

12   have adversely impacted the ability for Nextel to provide

13   service to its customers.

14           As far as who has what burden of proof, I think what

15   plaintiff has failed to comment upon is our citing to the

16   Gieron case, which is in our main brief, where they talk about

17   the burden is on the provider to show that there are no

18   alternatives.

19           THE COURT:  No, I read the Gieron case after I read

20   what they said about the Gieron case in their reply brief, and

21   you are not reading it correctly.

22           MR. FONTANA:  With all due respect, Judge, I believe

23   they commented on the ATP case and not on the Gieron case.

24           THE COURT:  The Minnesota case.

25           MR. FONTANA:  Yes, that is the ATP case.  The Gieron

1    case is a Georgia case.

2              THE COURT:   I am more persuaded by Minnesota than I

3    am by Georgia.

4              MR. FONTANA:   I have nothing else to add, your Honor,

5    unless the court has more questions.

6              THE COURT:   No.   You can keep on talking but I think

7    this is pretty much open and shut.   Go ahead and have a seat.

8              The plaintiff Nextel of New York is a wireless

9    communications company that operates a personal wireless

10   system in certain areas of the United States, including New

11   York.   It brings this action under the Federal

12   Telecommunications Act of 1996 to enjoin the City of Mount

13   Vernon Planning Board from denying its application for a

14   special permit to install antennas and related

15   telecommunications equipment in the city.

16             The gravamen of the plaintiff's claim is that Mount

17   Vernon violated the TCA, Telecommunications Act, because the

18   denial of the application was not in writing and is not

19   supported by substantial evidence but, rather, one, is based

20   on ungrounded fears of radio frequency emissions, and, two,

21   defendants have unreasonably delayed Nextel's application.

22             Based on the facts and the well-settled law in this

23   area, it is my finding that the plaintiff has met the heavy

24   burden of establishing the need for mandatory injunction, and

25   as the parties have consented to have this matter treated as a

12

1   motion for a summary judgment, a permanent mandatory

2   injunction will issue.

3           On March 31, 1999, plaintiff Nextel filed an

4   application with the City Building Department for permission

5   to install a wireless communications facility consisting of 12

6   panel antennas and a 219-square foot equipment room to be

7   placed on the roof of an existing building located at 21-29

8   West Sidney avenue.  It is an apartment building that is zoned

9   for senior citizen residence.  Along with the application,

10  Nextel submitted the required fees and a site plan.  On April

11  14, 1999, Deputy Building Commissioner Peter Greco sent Nextel

12  the plant examiner's report, which noted that because the

13  application was for a public utility facility, a special use

14  permit would be required from the Planning Board.  No

15  variances were required.  Mr. Greco's report concluded with

16  "The Building Department recommends approval of a special use

17  permit by the Planning Board."

18          On May 12, 1999, Nextel filed an application with the

19  defendant Planning Board in a package of materials sent to

20  defendant David Woods, planning director of the Department of

21  Planning and Community Development.  Included in the

22  application were a statement of principal points.  It included

23  a Bell Laboratories Health and Safety Report, which concluded

24  that the facility would be in complete compliance with FTA

25  radio frequency emissions requirements, and the affidavit of

1    Nextel radio frequency engineer Robert Bertona, establishing

2    that Nextel had a gap in service in Mount Vernon and that the

3    new facility would fill the service gap.  The site plan

4    included visual renderings of the proposed facility and

5    statements concerning the low impact the facility would have

6    on the surrounding neighborhood because it would be unmanned

7    and would not generate solid waste, garbage, waste water, or

8    any emissions other than radio frequency emissions.

9         In the original site plan, eight of the antennas were

10   to be flush-mounted on the face of the building's penthouse,

11   with the other four antennas to be roof-mounted.  On the same

12   day, Nextel forwarded the application package to nine city

13   departments for their review.  It was also subject to review

14   by Westchester County.

15        On May 26, Nextel received comments from the city,

16   which included a fax from Mr. Woods, a copy of the upcoming

17   Planning Board agenda, a May 16 memo from Mr. Woods to the

18   Planning Board, and a May 17 memo from Police Commissioner

19   Gertrude La Forgia, stating her concern that the facility may

20   possibly interfere with the department's radio equipment.

21        The memorandum that came from Mr. Woods to the chair

22   and the members of the Planning Board included his summary of

23   criteria the Planning Board had developed in reviewing

24   previous applications for wireless facilities.  These included

25   the requirement that applicants shall certify and demonstrate

1    by a preponderance of the evidence that colocation is not

2    technically feasible.  The applicant must certify that the

3    applicant made a reasonable attempt to colocate, providing

4    evidence by identifying other buildings approached and the

5    like.  Second, the applicant must flush-mount antennas on the

6    side of the building, must camouflage the antennas to make

7    them aesthetically pleasing, must use the latest equipment to

8    meet their needs, and must conduct a nonionizing

9    electro-magnetic radiation study and have the study certified

10   by an independent consultant that the findings are within the

11   threshold of the FCC, also, to show that they don't interfere

12   with the fire and communications system.

13          There were various other criteria as well, one of

14   which involved radiation testing having to do with the

15   potential and mostly unknown health risk that these facilities

16   may inflict.  It is of course the absolute mandate of Congress

17   that these speculative health reasons not be the basis for

18   holding up or denying any permit to a wireless facility.

19          Woods' memorandum to the Planning Board concluded

20   that the application could not be approved because the

21   applicant has not, by a preponderance of the evidence,

22   provided evidence that it attempted to colocate the

23   facilities, thereby lessening the total impact on the rest of

24   the city, and that the applicant proposes to flush-mount only

25   8 of the 12 antennas.

9b5knexa

15

1          So those were the two reasons given by Mr. Woods for

2     recommending that the Planning Board deny the application for

3     a special use permit.

4          On May 28, 1999, the plaintiff submitted a second

5     health and safety analysis prepared by Scinetic Corporation,

6     which again established the facility would comply with all

7     applicable FCC guidelines concerning radio frequency

8     emissions.  The plaintiff also submitted a certification by a

9     licensed engineer that the facility would not interfere with

10    the Police Department's radio equipment.

11         On June 2, Nextel's counsel appeared at the regular

12    meeting of the Planning Board and explained that Nextel would

13    flush-mount all 12 antennas.  Nextel's engineer Robert Bertona

14    was also present at the meeting and he explained why Nextel

15    could not colocate the facility on either of the other two

16    mobile antenna facilities, the AT&T facility on the Con Ed

17    building and the Bell Atlantic mobile facility.

18         There is an affidavit in this record, I think there

19    may be two affidavits even from Mr. Bertona, setting out the

20    technical reasons why one building was too tall, one building

21    already had a colocated provider on it.  That building was too

22    crowded already.  The Planning Board expressed concerns that

23    there would be three or four or five providers colocated on

24    that particular building.  One would not even come close to

25    covering the gap and the other would go into too wide an area

SOUTHERN DISTRICT REPORTERS (212) 805-0300

1   so that Nextel customers outside of the gap area would be

2   subjected to interference with Nextel equipment.  In short,

3   Mr. Bertona had a variety of what seemed to me good and sound

4   reasons why colocation was not such a hot idea.

5       Nextel was then told to meet with the residents of

6   the building, a new requirement now popping up.  The complaint

7   alleges that the Planning Board member Edwards explained that

8   if the residents of the building came to the public meeting to

9   complain, the Planning Board would deny the application and

10  the plaintiff would have to sue the city to be able to install

11  the facility.  As I say, that is a statement that is contained

12  in the complaint and in the supporting papers.  There is no

13  rebuttal to that statement in the record, and in view of what

14  happened subsequently, I find it to be true.  The public

15  hearing was set for July 7, 1999.

16      On June 21, appearing for the public meeting, Nextel

17  wrote to Mr. Woods to respond to his concerns about the

18  flush-mounting and colocation.  That letter included

19  Mr. Bertona's affidavit, visual renderings showing the

20  appearance of the facility with flush-mounted antennas and a

21  revised site plan, and that went to all nine of the city

22  departments that received Nextel's earlier submission.

23      On June 28, city manager Woods called Nextel's

24  counsel to request a long environmental assessment form and

25  additional copies of materials.  Woods stated in the

1    conversation that based on the relocation of the antennas he

2    would recommend to the board that it approve the facility.

3    The environmental assessment form was provided by hand that

4    day.

5           Later on June 28, Nextel's counsel and Bertona and a

6    Bell Laboratories engineer met with the residents of the

7    building as per Mount Vernon's request.  Concerns were limited

8    to questions of potential interference with the residents'

9    television cable and security system.

10          On July 6, the Westchester County Planning Board sent

11   a letter to the city manager, stating that there were no

12   county or intermunicipal planning issues of concern to the

13   county Planning Board.

14          You would think by this time Nextel had jumped

15   through enough hoops to get this approved.  But there was a

16   public hearing on July 7 and the Planning Board asked some

17   questions about the relocation of the antennas from the roof

18   to flush-mounting, and then they opened the floor to the

19   public.

20          What happened then is what happens at all these

21   public meetings.  A few residents got up and they noted

22   aesthetic objection, the building wouldn't look as nice with

23   the antennas up there on their roof, and at least one person

24   discussed concerns about electronic interference and one other

25   mentioned health concerns.  Three additional residents got up

1  to speak in opposition to the facility based on aesthetics or

2  potential health dangers.  No questions were raised either by

3  the public or the board members about Nextel's selection of

4  this building for placement of the facility.

5          On July 13, 1999, Nextel submitted a planning map

6  which someone had requested, to indicate where in Westchester

7  County Nextel contemplated installing future wireless sites.

8  I note that that is a map that goes well beyond the boundaries

9  of the City of Mount Vernon.  In the same correspondence,

10  Nextel requested a date when the board was going to act, and

11  then it begins.

12          On July 15, Mr. Woods phoned the office of Nextel's

13  counsel and said that the Planning Board did not believe that

14  Nextel was unable to colocate its facilities with a cellular

15  phone carrier on the Con Ed building.  So they sent another

16  affidavit in from Mr. Bertona explaining why that was not

17  technologically feasible.  They also sent an affidavit of

18  Nextel's project manager, Esme Lombard, explaining that

19  Westchester County owned the Con Ed building and Nextel was

20  unable to obtain reasonable lease terms in connection with

21  other sites that Nextel had sought with the county.  Obviously

22  the county wants the local municipalities to take the

23  political heat, so they are not going to rent their

24  facilities.

25          On September 9, the city commissioner recommended

1   that the application, which only two months earlier he had

2   wanted to approve, be denied, based on the finding that "the

3   applicant does not make an adequate case for why this building

4   is the only building that they are able to locate."  Now, we

5   are not talking about colocating, we are talking about

6   locating.  It is apparently the Planning Board and Mr. Woods'

7   position that Nextel has to explain why each and every

8   building in Mount Vernon is not as suitable as this building.

9          The Planning Board scheduled the application for

10   consideration on September 15.  Four of the seven board

11   members were present.  A presentation was made.  One of the

12   board members who hadn't been present in any of the previous

13   meetings or at the public hearing suggested that Nextel build

14   a new tower rather than using an existing building, and he is

15   the person who did note that when Nextel's use of a

16   residential building at 531 East Lincoln Avenue was approved,

17   Nextel had been urged to use nonresidential buildings for its

18   future installations.

19          Then the board members started to complain that they

20   had asked for or requested information regarding interference,

21   visual impact and future sites within Mount Vernon and saying

22   that they hadn't gotten any of that, when in fact it had all

23   been provided weeks and even months in advance of the meeting.

24          Nextel's counsel explained to the board that the

25   zoning code of the city of Mount Vernon expressly permitted

1    the use of residential buildings for this facility through a

2    special use permit and that two independent reports had been

3    submitted certifying that the facility would be safe.  Mr. De

4    Bellis responded, and I take this from the record, "It doesn't

5    make a difference, people don't trust government, they don't

6    trust these reports and we feel it locally.  After you're

7    gone, we feel it locally."

8         A motion was then made.  This is in response to the

9    argument that Mount Vernon hasn't done anything yet.  A motion

10   was made, seconded, and, a quorum of the Planning Board being

11   present, it was voted on.  The board voted three votes to one

12   to deny Nextel's application for the special use permit.  No

13   findings of fact were enumerated, listed, discussed or

14   presented.  No reason was expressed as a basis for denial.

15        On September 15, 1999, Nextel made a formal FOIL

16   request for a copy of the materials in the file, and this

17   litigation followed.

18        The governing law in the case is the TCA, which was

19   enacted to support the rapid deployment of new

20   telecommunications technologies.  The Second Circuit has

21   recognized the importance of this law in the field of

22   telecommunications.  They have recognized that the law was

23   intended, in the words of the Conference Committee, "to

24   provide for a pro-competitive, deregulatory national policy

25   framework designed to accelerate rapidly private sector

1    deployment of advanced telecommunications and information

2    technologies and services by opening all telecommunications

3    markets to competition."  That is this year's case of Cellular

4    Telephone v. Town of Oyster Bay, 166 F.3d 490, Second Circuit

5    1999.

6         The law requires in pertinent part here that any

7    decision by a state of local government or instrumentality

8    thereof to deny a request to place, construct or modify

9    personal wireless service facilities shall be in writing and

10   supported by substantial evidence contained in a written

11   record.  The law further provides that a state or local

12   government or instrumentality thereof shall act on any request

13   for authorization to place, construct or modify personal

14   wireless service facilities within a reasonable period of time

15   after the request is duly filed with such government or

16   instrumentality, taking into account the nature and scope of

17   the request.  And finally the law requires, no state or local

18   government or instrumentalities thereof may regulate the

19   placement, construction and modification of personal wireless

20   service facilities on the basis of environmental effects of

21   radio frequency emissions to the extent that such facilities

22   comply with the commission's regulations concerning such

23   emissions.

24        While the Second Circuit noted in the Cellular case

25   that traditionally federal courts have been extremely

1    deferential in reviewing local zoning decisions, the court

2    emphasized that the siting provisions of the TCA make it clear

3    that local zoning decisions denying the siting of federally

4    licensed wireless facilities are subject to judicial

5    oversight.  Although Congress explicitly preserved the local

6    zoning authority in all other respects over the siting of

7    wireless facilities, the method by which siting decisions are

8    made is now subject to judicial oversight and denials subject

9    to the TCA are reviewed by a federal court more closely than

10   standard local zoning decisions.

11           So, as Judge Brieant of this court noted recently,

12   while the TCA does not completely preempt the authority of

13   state and local decision-makers regarding the placement of

14   wireless communications facilities within their borders, it

15   quite clearly preempts any state regulation that conflicts

16   with its provision.

17           The defendants assert, without support, that the

18   burden is on the plaintiff to demonstrate that the proposed

19   site is the only site from which to effectuate wireless

20   service in the desired geographic location.  That is at page 5

21   of the defendant's brief.  Such an assertion is without basis

22   in law.  The TCA requires that any decision by a state or

23   local government or instrumentality thereof to deny a request

24   to place, construct or modify a personal wireless service

25   facility shall be in writing and supported by substantial

1    evidence contained in a written record.

2            In Cellular, the Second Circuit declined to address

3    the question of whether the district court had correctly

4    placed the burden of proof on the town to prove that its

5    decision was supported by substantial evidence, or whether the

6    applicant must prove that the locality's decision was not

7    supported by substantial evidence.  Other courts have viewed

8    the clear language of the statute to mean that the locality

9    bears the burden of proving that its denial was based on

10   substantial evidence contained in a written record.

11           This is the Cellco Partnership case from Connecticut.

12   There is a Massachusetts case called Sprint Spectrum v. Town

13   of Easton.

14           I must say that the plain meaning of the words used

15   in the statute seems to me to impose a burden on Mount Vernon

16   to establish that its decision is supported by substantial

17   evidence.

18           However, regardless of whose burden it is, in this

19   particular case there is no indication that Mount Vernon's

20   decision was supported by any evidence at all.  There is a

21   decision that has been made and I reject the notion that no

22   decision has been made.  A motion was made, it was seconded,

23   and a vote was taken.

24           So a decision has been made to deny, but no reason

25   therefor has been given.  No findings of fact were made by the

9b5knexa

24

1    board, in contravention of the usual practice at these

2    planning boards, zoning boards.  At least when I was a zoning

3    board counsel in my town we always had to have findings of

4    fact available so that the board could adopt them.  But

5    nothing like that happened.

6         The only evidence in the record is what Nextel has

7    put in.  It is convincing, but more than convincing it's all

8    there is, it's all there is, and in the face of that evidence

9    there is no evidentiary basis whatsoever for the Mount Vernon

10   Planning Board to have made the decision that it made, let

11   alone to support a finding that it was made on substantial

12   evidence.  It was made on no evidence at all, and of course it

13   is well settled that the speculative musings of disgruntled

14   citizens who don't like the way something is going to look or

15   are worried about these health considerations are not evidence

16   at all.  They are not evidence and they cannot be the basis

17   for denying an application.

18        The substantial evidence standard requires a court to

19   apply the traditional standard used for agency decision

20   review, and the standard of review is deferential.  The court

21   may neither engage in its own fact finding nor supplant the

22   town board's reasonable determinations.  However, when the

23   town board has done no fact finding and has not made a

24   reasonable determination, then it is clearly the intent of the

25   framers of the Telecommunications Act that a federal district

1    court will step in and will do for the town what the town will

2    not do for itself.

3         I am particularly concerned in this case about the

4    delay aspect, because it is obvious to me from the record that

5    every time Nextel would jump one fence, somebody would very

6    hastily construct a new fence.  The town's concerns up until

7    September 15 appear to be the issue of flush-mounting the

8    antennas.  The question of colocation -- and I do note again

9    that the Planning Board has apparently adopted criteria for

10   looking at these things which include efforts to colocate and

11   I assume thereby to minimize the number of facilities within

12   the city.  But clearly the concern up till September was

13   colocation, and the public concerns are, of course,

14   irrelevant, the Second Circuit having held that generalized

15   aesthetic concerns don't meet the substantial evidence test,

16   and the TCA explicitly stating that these speculations about

17   health will hold no weight in the face of certification from

18   appropriate engineers and scientists that the facility meets

19   federal standards therefor.

20        And then the rules change.  Then suddenly in

21   September it becomes, not can you colocate and can you

22   flush-mount your antennas, but isn't there someplace else that

23   you could have put this thing.  It is obvious that somebody

24   was getting some political heat and that the members of the

25   Planning Board decided that all things considered they would

1    rather not be responsible for this decision and for any local

2    outcry that might ensue, and it certainly lends credibility to

3    the allegation made by Nextel that somebody at the outset of

4    this said if anybody gripes we're just going to deny it and

5    you're going to have to go to court.  They have gone to court

6    and you've got me and the only gripe I've had is that I have

7    had to pay any attention to this.

8         Standards for injunctive relief are heightened where

9    the plaintiff seeks a mandatory injunction, but where the

10    issue is the siting of telecommunications facilities under the

11    TCA, case law points to the appropriateness of the mandatory

12    injunction, the Cellular case, the Sprint Spectrum case, which

13    actually -- is that Judge Parker's case?  Yes, Judge Parker's

14    case.  We seem to have a lot of these in Westchester -- and

15    the Mills case.  I find that the plaintiff has established

16    that it is substantially likely to succeed on the merits and

17    has in fact succeeded on the merits.  The plaintiff will be

18    irreparably injured if it is not permitted to put up its tower

19    in compliance with the TCA, and accordingly the plaintiff is

20    entitled to summary judgment granting the relief sought, that

21    being a mandatory injunction that will permit it to proceed

22    with the installation of its facility at the earliest possible

23    date.

24         So that takes care of that.  Now you need to get me

25    an injunction first thing next week.  Mr. Snyder.

9b5knexa

27

1          MR. SNYDER:  A proposed order, Judge?

2          THE COURT:  Yes.

3          MR. SNYDER:  Will do.  Thank you, Judge.  Does the

4    court have a copy of that very scholarly decision to hand out

5    today?

6          THE COURT:  No, actually, I don't, and it was a lot

7    less fluid than it was when my law clerk, who is not here

8    today, who is delivering a paper at Stanford University -- I

9    am very proud of her for that -- did it.  But it is kind of

10   notey and episodic.  So if I were you I would order the

11   transcript.

12         MR. SNYDER:  Very good, Judge.

13         THE COURT:  That was the idea.

14         MR. SNYDER:  Judge, some housekeeping matters.

15   Before we knew we were assigned to your courtroom, we did not

16   know that your rules required a table of authorities in our

17   original moving papers.  We have that table of authority

18   today.

19         THE COURT:  It's OK, you have already won.

20         MR. SNYDER:  And we have two hard copies of the reply

21   memorandum if that pleases the court.

22         THE COURT:  That's OK.  I've got it.  You faxed it.

23   Thank you very much.  It was helpful.

24         MR. SNYDER:  We did have a claim for damages in the

25   complaint, Judge.  How would the court like to handle that

9b5knexa

28

```
 1    count?
 2           THE COURT:  How would the court like to handle that
 3    count?  I suppose I can send you my standard 45-day order and
 4    you can set up a schedule for discovery on damages and we can
 5    have a trial.  I mean, I will send it for inquest to a
 6    magistrate.  But I assume that Mount Vernon might want to take
 7    a little discovery before they have to pay or maybe they will
 8    just be smart and pay you something.
 9           MR. SNYDER:  I am sure we can work it out.  I don't
10    think our client is particularly interested in pursuing a
11    damage claim, having obtained very gratefully the relief
12    granted this afternoon.
13           THE COURT:  I was hoping your client might feel that
14    way.
15           MR. SNYDER:  I think so, your Honor.
16           THE COURT:  You are not abandoning the claim and I am
17    not dismissing the case, but certainly as to your TCA count in
18    which you are seeking relief, I am granting you judgment
19    and --
20           MR. SNYDER:  Thank you, Judge.  We will work out the
21    other counts.
22           THE COURT:  And I was hoping that deciding it very
23    quickly everyone would move on to other business.
24           MR. SNYDER:  Consider it done.
25           (Proceedings adjourned)
```

**Exhibit 2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



——————————————————————————x

SPRINT SPECTRUM L.P. d/b/a SPRINT PCS,

                Plaintiff,

against                                                                    02 Civ. 6446 (CM)

THE VILLAGE OF TARRYTOWN, THE VILLAGE
OF TARRYTOWN BOARD OF TRUSTEES, MAYOR
PAUL JANOS, DEPUTY MAYOR DOMENIC J.
MORABITO, THOMAS BASHER, SR., DENNIS
CHILLEMI, SHERWOOD CHOROST, DREW FIXELL,
SUSAN SINCERO, and JULIA FULLENWEIDER
constituting the past and present Board of Trustees;
THE VILLAGE OF TARRYTOWN PLANNING
BOARD, CHAIRMAN STANLEY FRIEDLANDER,
BRUCE CARLINO, ANNETTE FAGO, HENRY
RISSMEYER and RON TEDESCO,

                Defendants.

——————————————————————————x

MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION PREVENTING DEFENDANTS FROM ENFORCING THE
VILLAGE OF TARRYTOWN'S MORATORIUM ON THE CONSTRUCTION OF
TELECOMMUNICATION FACILITIES

McMahon, J.

       On November 30, 2001, Sprint submitted an application to the Village of Tarrytown
Planning Board for site plan approval to install a federally licensed wireless communications
facility (the "Facility") on an existing 107 foot tall building located at 1 River Plaza, Village of
Tarrytown (the "Building"). The Facility was to consist of twelve antennas mounted on the roof
of an apartment building, together with related equipment.

       Counsel for Sprint appeared at a regular meeting of the Village Planning Board on
January 28, 2002. Counsel described its proposal as the installation of twelve panel antennas

MICROFILM

SEP 12 2002

USDC SDNY

1

mounted on the roof of the residential apartment building located at the Site, together with about six equipment cabinets. He described the tallest cabinet as about 8 ½ feet tall. The Planning Board asked why an existing Sprint site could not provide coverage to the area in question, and why a site located at a higher ground elevation had not been selected. Sprint's counsel responded that this location gave the line of sight that Sprint was seeking, but that he would supply additional information about other locations that Sprint had researched.

Members of the Planning Board moved to discuss Sprint's application at a public hearing on February 25, 2002.

By letter dated February 15, 2002, Sprint responded to comments raised at the January 28, 2002 Planning Board meeting. Sprint submitted a revised site plan and an affidavit from an engineer concerning the gaps in coverage experienced by Sprint. The affidavit stated that the existing site in the Village did not extend into the area to be covered by the Facility. A Sprint engineer had used a computer program to demonstrate that the proposed Facility would remedy the gap. The letter also stated that Marymount College was not a feasible alternative to the proposed site since Sprint was unable to obtain a lease agreement at that location.

On February 25, 2002, Sprint's counsel appeared before the Planning Board. Counsel explained that due to the Planning Board's concern regarding visual impacts, Sprint had revised its site plan to include screening around the proposed equipment cabinets, and that such screening would be designed to match the existing penthouse. Numerous residents of the Building spoke against the Site Plan application, and some expressed concerns about the adverse health effects from radio frequency emissions. The minutes of the meeting state that "Mr. Tedesco [a Planning Board member] stated that given the growing number of antennas coming into the community and the cumulative effects of radiation on individuals, he felt it might be good if Sprint used some creativity to come up with a location away from where people reside." (February 25 Minutes, Exh. 4 to Gaudioso Aff. Appendix.) Sprint's Counsel reminded the Board of the need for the Facility to fix a gap in coverage and that the Facility would emit radio frequencies well below the maximum level permitted by the FCC.

Sprint's counsel did not convince the Planning Board to take action. The Board thus adjourned the hearing until March 25, 2002, and directed Sprint to schedule a meeting with the Tenants' Association of the Building. According to Sprint, the Planning Board requested that Sprint retain a health expert to attend the meeting with the tenants to answer their questions, in spite of the fact that Sprint had submitted an expert written report confirming compliance with the federal exposure standard. Sprint scheduled the meeting with the Tenants' Association for March 21, 2002.

On March 4, 2002, the Board of Trustees conducted a regular meeting in which Mr. Plunkett, Village Attorney for the Village of Tarrytown, discussed the town's progress in studying the impact of telecommunications facilities within the Village of Dobbs Ferry, Irvington, and Tarrytown. The Board then adopted a resolution scheduling a public hearing for March 18, 2002 to consider adopting a moratorium on the construction of telecommunications facilities within the Village.

Three days before the hearing on the moratorium, Sprint's counsel wrote to the Board of Trustees to request that the proposed moratorium be revised to allow the processing of Sprint's application. Sprint also asked that the Board attend the scheduled meeting with the Tenants' Association before making its decision on the proposed moratorium.

At a regular meeting of the Board of Trustees, conducted on March 18, 2002, the Board conducted a hearing on the adoption of a moratorium, and enacted the moratorium. The Village informed Sprint that the continuation of the public hearing, which had been scheduled for March 25, 2002, was cancelled.

The Village claims that since the moratorium was passed, the Village has taken steps to issue new regulations. The Village's counsel began drafting legislation for new regulations for wireless communications facilities in the Village. In addition, the Village Board has met with members of the community in work sessions to discuss the proposed new regulations. On September 3, 2002, at a regularly scheduled Village Board meeting, the proposed new regulations were discussed with public comment. The public hearing has been adjourned until the next Village Board meeting, scheduled for September 17, 2002. The Village therefore claims that it is proceeding deliberately and in good faith to update its laws to comply with the Telecommunications Act.

Plaintiff points out that the Telecommunications Act was enacted over six years before the proposed moratorium. They also assert that the Village of Tarrytown has a history of enacting moratoria which prohibit the installation of wireless telecommunications facilities.

Plaintiff notes that in September of 1994, the Board of Trustees adopted Local law, 1994, Chapter 212 of the Code of the Village of Tarrytown, entitled "Moratorium on the Installation of Antennas", which precluded granting any municipal approval for wireless facilities for three months. The First Moratorium was based in part upon legislative findings that "long-term scientific studies are necessary on the emissions of the electromagnetic frequency radio emissions." This Moratorium was declared invalid on October 3, 1994 by Judge Louis Barone, Supreme Court for the State of New York for Westchester County, holding that "a perception of a possible danger is not grounds for emergent relief in the face of scientific data emphasizing no danger to the public." Cellular Telephone Co. d/b/a/ Cellular One v. Village of Tarrytown, (Westchester County Supreme Court Index No. 14916-94) rev'd and remanded, 210 A.D.2d 196, 619 N.Y.S.2d 746 (2d Dept. 1994) (granting preliminary injunction, but reversing grant of permanent injunction as premature and remanding to Supreme Court for final determination).

On the same day that the First Moratorium was invalidated, the Board of Trustees issued another wireless moratorium, Local Law, 1994, Chapter 213 of the Code of the Village of Tarrytown, entitled "Temporary Moratorium on Installation of Antennas" (the "Second Moratorium"). The Second Moratorium was invalidated in November, 1994, in Cellular Telephone Co. d/b/a Cellular One v. Village of Tarrytown, (Westchester County Supreme Court Index No. 16733-94). In declaring the Second Moratorium null and void, Judge Barone held that "the Village cannot, by law override a federal mandate by the enactment of a moratorium based

3

solely on a perception of risk." Id. The Supreme Court's decision was upheld by the Appellate Division, Second Department, on March 13, 1995. Cellular Telephone Co. v. Village of Tarrytown, 209 A.D.2d 57, 624 N.Y.S.2d 170 (2d Dep't 1995).

On May 10, 2002, Sprint filed an application for a waiver from the Third Moratorium.

Plaintiff's Third Moratorium was initially enacted for ninety days. It was re-enacted and extended for an additional ninety days on June 17, 2002.

On June 17, Mr. Kooyman, a Site Development Manager for Sprint, appeared before the Board of Trustees to discuss the Waiver Application. Mr. Kooyman states that Mayor Paul Janos repeatedly questioned him whether Sprint could guarantee that the Facility would be safe with respect to radio frequency emissions. The only other information requested by the Board at the June 17 meeting pertained to a structural certification and a request for confirmation that Sprint's electrical use would not diminish the overall electric capacity in the Building. The Village did not act on the Waiver Application at the June 17 meeting.

Mr. Kooyman appeared at the Board meeting on July 15. After the close of the public portion of the meeting, Mayor Janos stated that he had a resolution with respect to Sprint's application for a waiver from the moratorium, and then proceeded to announce that the documents submitted by Sprint did not satisfactorily demonstrate hardship. The Board then voted to deny Sprint's application for a waiver from the moratorium for failure to provide satisfactory documentation of hardship.

On September 3, 2002, the Village announced that it intends to extend and re-enact the moratorium. (Gaudioso Reply Aff. ¶ 27.)

Sprint seeks an order to: (i) enjoin and declare unlawful the third and fourth cellular moratoria enacted by the defendants which prohibit the processing of applications for wireless facilities; (ii) to enjoin and declare unlawful the denial by defendants of plaintiff's application for a waiver from such moratorium; (iii) to enjoin and declare unlawful defendant Planning Board's delay of plaintiff's site plan application; and (iv) to direct defendants to issue all approvals required for plaintiff to install the Facility on an existing 107 foot tall building. Sprint contends that the moratorium violates provisions of the Telecommunications Act that prohibit (a) the denial of an application without a writing and without substantial evidence; (b) any unreasonably delay in determining the application of a telecommunications provider to construct and install facilities; (c) the denial of an application based upon concern over health effects of telecommunications facilities; and (d) unreasonable discrimination. Second, Sprint claims that the moratorium violates its due process rights. Finally, Sprint argues that the moratorium was adopted in violation of certain local laws requiring the Village to refer the statutory issues to adjacent municipalities and to state which laws it

Defendants argue that (1) Sprint's application for a preliminary injunction is time barred; (2) the moratorium did not violate any provisions of the Telecommunications Act of 1996; (3)

Sprint has failed to demonstrate a likelihood of success on the merits of the state law claims; and (4) Sprint has failed to establish irreparable injury.

DISCUSSION

<u>Standard for a Preliminary Injunction</u>

Ordinarily, a party seeking an injunction must establish that "(1) absent injunctive relief, it will suffer irreparable harm, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." <u>Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.</u>, 175 F.3d 266, 270 (2d Cir. 1999). When a moving party seeks an injunction that will affect government action, however, the more rigorous showing of likelihood of success on the merits is required. <u>Beal v. Stern</u>, 184 F.3d 117, 122 (2d Cir. 1999). In addition, when the injunction sought "will alter rather than maintain the status quo," the movant must also show "clear" or "substantial" likelihood of success. <u>No Spray Coalition, Inc. v. City of New York</u>, 252 F.3d 148, 150 (2d Cir. 2001) (citing <u>Rodriguez v. DeBuono</u>, 175 F.3d 227, 233 (2d Cir. 1999)).

When a plaintiff has demonstrated compliance with the applicable standard, injunctive relief is the appropriate remedy when a governmental body violates the Federal Telecommunications Act of 1996. <u>Cellular Telephone Company v. Town of Oyster Bay</u>, 166 F.3d 490, 497 (2d Cir. 1999).

<u>The Telecommunications Act</u>

The Telecommunications Act of 1996 (or the "TCA"), Pub. L. 104, was signed into law more than six years ago. The TCA imposes limitations on the "regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof. 47 U.S.C. § 332(c)(7). The TCA was intended "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services . . . by opening all telecommunications markets to competition. . . ." <u>Cellular Telephone Co. v. Town of Oyster Bay</u>, 166 F.3d 490, 493 (S.D.N.Y. 1999) (quoting a TCA Conference Committee report found at H.R. Conf. Rep. No. 104-458, at 206 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 124).

The TCA is an "unusually important legislative enactment," establishing a national goal of encouraging the "rapid deployment of new telecommunications technologies." <u>Reno v. ACLU</u>, 521 U.S. 844, 857 (1997). The Second Circuit has embraced this view, holding that the TCA was intended to "[a]ccelerate rapidly private sector development of advanced telecommunications and information technologies and services by opening all telecommunications markets to competition." <u>Oyster Bay</u>, 166 F.3d 490, 492-93 (2d Cir. 1999).

5

In order to foster the growth of the telecommunications industry, Section 332 of the TCA requires, inter alia, that a denial of a request to build a personal wireless service facility must be "in writing and supported by substantial evidence." 42 U.S.C. § 332(c)(7)(B)(iii). Local governments must decide any request for authorization to construct a personal wireless service within a "reasonable period of time," 42 U.S.C. § 332(c)(7)(B)(ii), and are prohibited from unreasonably discriminating" among providers of functionally equivalent services, 42 U.S.C. § 332(c)(7)(B)(i)(I). Furthermore, local governments may not "regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emission to the extent that such facilities comply with the Commission's regulations concerning such emission." 42 U.S.C. § 332(c)(7)(B)(iv).

Federal courts applying this law have not tolerated local action or inaction that unreasonably frustrates the purposes of the TCA. As the court observed in Lucas v. Town of LaGrange, 7 F. Supp. 2d 310, 321 (S.D.N.Y. 1998):

> Although the Telecommunications Act 'does not completely preempt the authority of state and local governments to make decisions regarding the placement of wireless communications facilities within their borders,' it quite clearly preempts any state regulations 'which conflict with its provisions.'

(internal citations omitted).

I.      Sprint's Claims Are Not Time Barred under either Federal or State Law

Defendants argue that Sprint's claims do not arise out of the Village's denial of Sprint's request for a *waiver* from the moratorium, but arise out of the moratorium itself. Therefore, defendants argue that plaintiff's claim is time-barred under federal and state law.

The Village also claims that the waiver provision does not even apply to Sprint's application because the moratorium provides that "[t]he Village Board of Trustees may at its sole discretion grant a waiver from the provisions of this law for applications for the expansion of *approved existing facilities*, based on hardship demonstrated to the Board's satisfaction." Moratorium § 4 (emphasis added). Defendants argue that since Sprint did not have an existing facility on the Apartment Building roof, the waiver provision does not apply to them. However, since there was already an antenna on the top of the building, used by the Greenburgh Police Department, Sprint had an argument that the Building was already an approved existing facility for radio antennas. Whether or not this was precisely what the Board meant when it drafted the language, Sprint made a good faith application for a waiver of the moratorium. The Board received, accepted, and acted upon plaintiff's moratorium waiver request.

Under the TCA, "[a]ny person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with [§ 704(a)(7)(B)] may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction." 47 U.S.C. § 332 (c)(7)(B)(v).

6

Sprint applied for a waiver of the moratorium, claiming that the Facility was (and still is) necessary to remedy an existing significant gap in wireless coverage and that Sprint would suffer irreparable economic injury if the waiver was not granted. Had the Village granted Sprint's waiver, litigation of this matter would have been avoided. This Court has seen far too many of these cases to penalize Sprint for attempting to avoid litigation by proceeding with the Board's procedures for receiving a waiver of the moratorium. Sprint did not sit on its rights in this case. Instead, it attempted to exhaust its administrative remedies by continuing its efforts with the Board to resolve this matter. The Board denied Sprint's waiver on July 15, 2002. Sprint commenced this suit challenging that action on August 14, 2002. I therefore find that plaintiff's federal claims are not time barred.

Likewise, plaintiff's state law claims are timely. It is well established that a party subject to a moratorium is not sufficiently aggrieved to seek judicial relief until it has exhausted all of its administrative remedies. Hawes v. State of New York, 161 A.D.2d 745, 556 N.Y.S.2d 101 (2d Dep't 1990). In Islip v. Zalak, 165 A.D.2d 83, 566 N.Y.S.2d 306 (2d Dep't 1991), the court stated that "so long as a reasonable possibility remains open that the local regulatory agency may waive or vary the application of the laws by which a party claims to be aggrieved, the question of whether such laws may legally be applied to the claimant remains hypothetical and abstract." Id. at 95.

I therefore find that plaintiff's federal and state claims are timely.

II.    Sprint Has Shown a Substantial Likelihood of Success on the Merits of its Claim that the Moratorium Violates the Telecommunications Act of 1996

The Telecommunications Act is intended to facilitate the construction of personal wireless services facilities by preventing local zoning authorities from unreasonably delaying wireless providers in the application process. See Sprint Spectrum, L.P. v. Town of Easton, 982 F. Supp. 47, 50 (D. Mass. 1997). The TCA requires local governments to "act on any request for authorization to place, construct, or modify personal wireless facilities within a reasonable period of time after the request is duly filed." 47 U.S.C. § 332(c)(7)(B)(ii).

Sprint submitted its application to the Village on November 30, 2001. Defendants claim that there has been no unreasonable delay in this case because they expeditiously processed plaintiff's application. It is true that the Board discussed Sprint's application at several board meetings, within a reasonable time frame. However, the Board has taken no *action* on Sprint's application other than to pass a moratorium and then deny Sprint's waiver from the moratorium. It thus has failed to act on Sprint's request within a reasonable period of time.

Although the TCA was enacted more than six years ago, the defendants claim that the moratorium is designed so that the Village can further regulate the facilities Congress sought to encourage with the TCA. Defendants contend that the moratorium does not constitute a denial of Sprint's application but, instead, is a deferral of the application adopted in order to give the Village time to enact needed laws regulating telecommunications facilities.

7

In Sprint Spectrum, L.P. v. Jefferson County, 968 F. Supp. 1457 (N.D. Ala. 1997), the local government adopted a moratorium 15 months after the enactment of the TCA. The court declared the moratorium invalid under the TCA, as an "unreasonable delay," prohibited under the TCA. Id. at 1468. In that case, the local government had enacted three moratoria. Likewise, in Sprint Spectrum, LP v. Town of Farmington, No. 3:97 Civ 863 (GLG), 1997 WL 631104 (D. Conn. 1997), a federally licensed telecommunications provider challenged a moratorium that prohibited the construction of new wireless facilities. The Court held that "by prohibiting Sprint from constructing a telecommunications facility, or even submitting an application for approval, for 270 days, the moratorium unreasonably delays consideration of Sprint's implementation requests and effectively prohibits wireless telecommunications services, in violation of §§ 332(c)(7)(B)(ii) and (B)(i)(I)." Id. at *6. In Nextel v. City of Yonkers, 01 Civ. 7061, this Court issued a temporary restraining order overturning a wireless moratorium, finding that "it is highly suspicious that this moratorium was enacted not a week or a month or even a year after the Telecommunications Act was enacted, but rather five years after the [TCA] was enacted." (Exh. 1 to plaintiff's Reply Br.).

Defendants point out that the moratorium in Jefferson County was enacted after a comprehensive regulatory scheme based on the TCA had already been enacted. They also note that the moratorium in Farmington, was for a period of 270 days, unlike the 180 day period in the case at hand. The Village asserts that it is not hostile to personal wireless service and has approved all applications submitted to it since the enactment of the Telecommunications Act, except for this one. Defendants fail to point out, however, that the Village of Tarrytown had enacted two previous moratoria prior to this case. Both of these moratoria were struck down by the courts because they were based on improper grounds. See Cellular Telephone Co. d/b/a Cellular One v. Village of Tarrytown, Westchester Co. Supreme Court Index No. 14916-94, rev'd and remanded, 210 A.D.2d 196, 619 N.Y.S.2d 746 (2d Dept. 1994) (granting preliminary injunction, but reversing grant of permanent injunction as premature and remanding to Supreme Court for final determination); Cellular Telephone Co. d/b/a Cellular One v. Village of Tarrytown, (Westchester County Supreme Court Index No. 16733-94), affirmed in, Cellular Telephone Co. v. Village of Tarrytown, 209 A.D.2d 57, 624 N.Y.S.2d 170 (2d Dep't 1995). Therefore, defendants' claim that this moratorium represents a bona fide effort to overhaul their zoning laws must be regarded with some suspicion.

Defendants cite Sprint Spectrum L.P. v. City of Medina, 924 F. Supp. 1036 (W.D. Washington 1996), where the court held that the city's six month moratorium on issuing permits for additional wireless communications facilities within its boundaries was a valid zoning tool, designed simply as a "short term suspension of permit-issuing while the City garners information and processes applications." Id. at 1040. In that case, however, the court noted that "nothing in the record suggests that this is other than a necessary and bona fide effort to act carefully in a field with rapidly evolving technology." Id. This is not the same situation before this Court, because the Village of Tarrytown has a history of impeding the goals of the TCA by enacting moratoria based on improper grounds.

Under Cellular Telephone Co. v. Rosenberg, 82 N.Y.2d 364, 371, 604 N.Y.S.2d 895, 624 N.E.2d 990 (1993), when a public utility applies for a land use decision (in this case, a waiver

8

from the moratorium), the requested relief must be granted "where the intrusion or burden on the community is minimal." Id. at 372. The Rosenberg court also made clear that a board may not exclude a utility from a community where the utility has shown a need for its facilities. Id.; see also Oyster Bay, 166 F.3d at 494.

Plaintiff has made a strong showing that passage of the moratorium, and the denial of the waiver therefrom, unreasonably delayed plaintiff's Planning Board application in response to the vague and generalized concerns expressed by tenants of the Building regarding perceived adverse health effects. Defendants announced on September 3, 2002 that the Village intends to extend and re-enact the moratorium. (Gaudioso Reply Aff. 27.) The moratorium and the denial of plaintiff's waiver request have operated to indefinitely delay and suspend the processing of plaintiff's application.

I therefore conclude, for the purposes of this preliminary injunction motion, that the moratorium, and denial of a waiver of the moratorium, constitute an unreasonable delay under the TCA.[1]

III.    Sprint Has Shown a Substantial Likelihood of Success on the Merits of Its State Law Claims Warranting the Granting of a Preliminary Injunction against the Enforcement of the Moratorium

Under New York law, a moratorium will be declared invalid if it is not enacted in response to an immediate threat to public health, safety and welfare. The substantive provisions of the moratorium in the case at hand do not suggest that it was enacted in response to an immediate crisis, threat or emergency.

In Cellular Telephone Co. v. Village of Tarrytown, the Village attempted to address local health concerns over wireless facilities through a wireless moratorium. The Appellate Division voided the moratorium, holding that it was "a pretext to assuage strident community opposition." The court emphasized that "an exercise of the police power which interferes with the enjoyment of property must be a reasonable, necessary, and limited response directed at redressing a genuine crisis or emergency. . . ." Id. at 58. Thus, where judicial scrutiny reveals no compelling exigency sufficient to justify a moratorium, such laws will be struck down. See also Jefferson County, 968 F. Supp. at 1465 (invalidating a moratorium prohibiting construction of cellular facilities, in part on the ground that "there is no evidence that plaintiff's proposed cell sites pose any danger to public health or safety.").

In Nextel Communications v. Town of Huntington, (Suffolk Co. Supreme Court, reported in N.Y.L.J. Oct. 15, 2001, Court decisions at 17, available at LEXIS, Legal News, New York Law Journal), the New York State Supreme Court followed the holding in Cellular

---

[1] Indeed, as a rule of thumb, I believe that an application has been presumptively unreasonably delayed if it has not been acted on within six months of the date of filing. The presumption is rebuttable, of course, but in all the cases I have heard on this issue, no one has succeeded in rebutting it.

9

Telephone, *supra*, declaring a cellular moratorium enacted in June 2001 to be invalid. The <u>Town of Huntington</u> court reasoned that since the offending town had previously enacted a moratorium in 1998 to develop regulations with respect to wireless telecommunications facilities, and since there was no showing that the moratorium was intended to address a "genuine crisis or emergency," the moratorium was declared invalid:

> [T]here appears to be no "valid or reasonable purpose" for the moratorium. It purportedly was imposed . . . 'for the purpose of expediting orderly, well-informed and specific good faith amendments to the Huntington Town Code.' But the Code was substantially amended to address the very same topic in 1998. There is nothing in this record to suggest that the public health or safety is at risk. Further, the petitioner is charged as a utility with providing cellular service to the public, and the moratorium is preventing it from doing so.

Defendants argue that these cases are distinct from one at hand. They point out that <u>Cellular One</u> involved a moratorium that was passed solely to address health concerns. They also note that in <u>Town of Huntington</u>, the town had recently adopted a moratorium to amend its Town Code. However, these distinctions do not eliminate the fact that the Village of Tarrytown has already adopted two moratoria related to cell phone towers and related facilities. Both of these moratoria were declared invalid. Now, defendants have enacted (and extended) an additional moratorium claiming the need to amend their code to further regulate wireless telecommunications facilities.

Defendants have offered no justification why the current moratorium is necessary to address their concerns. Defendants claim that the moratorium is designed to conform their regulations to the TCA. But, the TCA was passed six years ago. Tarrytown has had plenty of time to draft conforming regulations. Moreover, the Sprint application was the only application pending when the moratorium was adopted. Plaintiffs have made a strong showing that the moratorium was directed at plaintiff's application, that it was motivated at least in part by health concerns over radio frequency emissions, and that no actual crisis or emergency precipitated the enactment of the moratorium.

I therefore find that plaintiffs have met their burden of showing a strong likelihood of success on the merits of their claim that the moratorium violates state law. Because I find that plaintiffs have demonstrated a substantial likelihood of success on the grounds that the moratorium is substantively invalid under New York law, I need not address Sprint's procedural arguments regarding the validity of the moratorium. The fact that defendants have made progress with their proposed legislation during the time the moratorium has been effect is heartening, however, there is no reason why they cannot consider the Sprint application at the same time, given how far along in the process Sprint was when the moratorium was declared.

IV.     Irreparable Harm

Irreparable harm is "injury for which a monetary award cannot be adequate compensation." <u>International Dairy Foods Ass'n v. Amestoy</u>, 92 F.3d 67, 71 (2d Cir. 1996)

10

(quoting <u>Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.</u>, 596 F.2d 70, 72 (2d Cir. 1979)). Plaintiff asserts that the irreparable harm it suffers as a result of not being allowed to create the Facility includes the loss of subscriber good will and subscriber revenue, which are difficult to quantify and virtually impossible to recover.

Economic injuries of this type constitute irreparable harm. <u>Iowa Utilities Board v. Federal Communications Commission</u>, 109 F.3d 418, 426 (8th Cir. 1996) (finding that potential loss of consumer goodwill qualifies as irreparable harm); <u>Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.</u>, 22 F.3d 546, 552 (4th Cir. 1994) (agreeing that the possibility of permanent loss of customers to a competitor or the loss of goodwill constitutes irreparable injury); <u>Telecorp Realty LLC v. Town of Edgartown</u>, 81 F. Supp. 2d 257, 261 (D. Mass. 2000) (granting injunction upon finding that "in today's quickly advancing world of telecommunication services, the cost of delay cannot be understated."). The delay imposed by the moratorium irreparably deprives Sprint of a portion of the value of its federal license, compromises the ability of Sprint to attract or retain customers, permanently devalues the good will Sprint is attempting to develop with the traveling public, and denies Sprint the revenue it would have generated had the Facility been permitted.

I also note that the balance of the equities favors plaintiff in this case. Plaintiff is a federally licensed public utility which operates in the public interest. <u>See</u> <u>Sprint Spectrum L.P. v. Mills</u>, 65 F. Supp. 2d 148, 155 (S.D.N.Y. 1999). Public health, safety and welfare will be well served if plaintiff is granted the injunctive relief it seeks. By contrast, defendants have put forth no evidence of the harm that they will suffer if the injunctive relief is granted.

## CONCLUSION

For the foregoing reasons, I grant plaintiff's request for a preliminary injunction against the Village of Tarrytown's moratorium. I order the Village to act on plaintiff's application. I am not directing the Village to issue the permit, so that it may hold the continuation of the public hearing that it promised to hold on March 25, 2002. However, I instruct defendants to be mindful of the mandates of the Telecommunications Act as it proceeds with plaintiff's application, and that I think the Village has had long enough to reach a decision. There are to be no further delays.

This constitutes the decision and order of the Court.

Dated: September 12, 2002

_____
U.S.D.J.

11

Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

SPRINT SPECTRUM, L.P. d/b/a/ SPRINT PCS,

                                    Plaintiff,

        -against-

VINCENT CESTONE, LEONARD LIM,
JOAN TURNER, CAROLINE KREBS and
VICTOR CARLSON, as and constituting the
ZONING BOARD OF APPEALS OF THE TOWN
OF PHILIPSTOWN, NEW YORK, TOM
MONROE, as BUILDING INSPECTOR OF THE
TOWN OF PHILIPSTOWN, NEW YORK, and
TOWN OF PHILIPSTOWN, NEW YORK.

                                    Defendants.

------------------------------------------------------x

Brieant, J.



00 Civ. 4828 (CLB)(GAY)

<u>MEMORANDUM & ORDER</u>

By motion filed on September 14, 2000 heard and fully submitted on December 8, 2000,

Plaintiff Sprint Spectrum, L.P. d/b/a/ Sprint PCS ("Sprint") moves for summary judgment

pursuant to Rules 56(a) and (c) of the Federal Rules of Civil Procedure in this action brought

under the Telecommunications Act of 1996 to compel the Town of Philipstown to issue a special

use permit and building permit authorizing Plaintiff to construct a cellular communications

facility at 1924 Route 9, Town of Philipstown, New York.  Defendants stipulated to filing an

Amended Complaint, which Plaintiff filed on November 21, 2000.  Defendants filed Opposition

on November 27, 2000.

By motion filed on November 27, 2000, Defendants move for summary judgment pursuant to Rules 56 and 12(b) of the Federal Rules of Civil Procedure. Plaintiff filed Reply on December 6, 2000.

## Parties

Plaintiff Sprint is a limited partnership organized under the laws of Delaware, maintaining its principal place of business in Missouri, and duly authorized to conduct business within the State of New York. Sprint is a provider of wireless telecommunication services and is engaged in constructing and operating a nationwide Personal Communications Service ("PCS").

Defendant Town of Philipstown, New York ("Philipstown" or "Town") is a municipal corporation organized and existing under the laws of the State of New York and situated in the County of Putnam. Defendants Vincent Cestone, Leonard Lim, Joan Turner, Caroline Krebs and Victor Carlson are and were, at all times relevant to this lawsuit, the members of the Zoning Board of Appeals of the Town of Philipstown, New York ("the ZBA"). Defendant the ZBA is and was, at all times relevant to this lawsuit, a board of the Town of Philipstown, New York charged with the responsibility of reviewing and acting upon applications seeking special use permits for construction of communications antennae in Philipstown. Defendant Tom Monroe is and was, at all times relevant to this lawsuit, the Building Inspector of the Town of Philipstown charged with the authority to issue building permits authorizing the construction of improvements upon real property.

2

## Factual Background

Sprint provides wireless communication services to the general public pursuant to a license granted to Sprint by the Federal Communications Commission. Sprint's communication technology uses a high frequency, low power radio signal transmitted between a customer's portable telephone and an antenna, which can be mounted on towers, monopoles, buildings, watertanks and other structures of suitable height. The antenna delivers the signal to related electronic devices housed in equipment cabinets at the base of the antenna, which then transmit the signal into a telephone land line for transmission into a national telephone network.

In order for the personal communication service to be operational, the low-power signal transmitted to and from an antenna must be unobstructed by land, foliage or other physical obstruction. In addition, there must be enough properly-positioned antennae in the system so that the coverage provided by any one antenna does not interfere with the signal transmission of another antenna, but instead overlaps with the coverage areas of other antennae and creates a seamless system providing consistent and reliable coverage.

In developing its communication network, Sprint identifies areas of deficient coverage, identifies sites from which coverage could be provided to those areas, and seeks permission to build upon those sites in a manner that satisfies the applicable zoning requirements.

Currently, there is a gap in Sprint's coverage in Philipstown along the corridor of U.S. Route 9 in the southwestern part of the Town, a gap which Sprint seeks to fill by constructing a

communications antenna in Philipstown. There is no existing appropriate structure on which antennae could be placed, and the possible locations for construction of a communications antenna are limited because of the topography of the area in Philipstown where cellular coverage is deficient.

Sprint seeks a special permit to construct a communications facility ("Proposed Facility") at 1924 Route 9, Town of Philipstown, New York ("Proposed Site"), which is located within an R-80 Residential Zone along U.S. Route 9. The Proposed Facility consists of a one-hundred-ten foot monopole fitted with nine panel antenna, ground-based equipment, which would be maintained in sheds within a fenced area measuring 30 feet by twenty-six feet, and the extension of an existing driveway. Sprint has proposed various designs to "camouflage" the monopole.

Located on the Proposed Site are the residence of Jae Kwan and Shin Ja Lee, and a commercial wholesale greenhouse operated by the Lees. The Lees have agreed to lease the Proposed Site to Sprint. The monopole would be located behind the greenhouse in the middle of the Lee property, and will comply with the zoning requirement that it be set back 150 feet from the property line. Philipstown Town Code §175-49.10(G)(3). On each of the three approximately two acre parcels located at the rear and each side of the Proposed Site, there is one single family residence.

On February 9, 1999, Sprint applied to Defendant Tom Monroe, Building Inspector of the Town of Philipstown for a building permit. Mr. Monroe denied Sprint's application on February

4

19, 1999, as a matter of course, to provide a basis for Sprint to seek a special permit. On February 19, 1999, Sprint appealed Mr. Monroe's decision to the Zoning Board of Appeals ("ZBA") and applied to the ZBA for a special use permit, as required under the Town Code, to construct a communications antenna on the Proposed Site. On March 1, 1999, the ZBA deemed the application complete and referred the application to the Planning Board of the Town of Philipstown (the "Planning Board") for an advisory report pursuant to Town Code §175-52.

On April 15, 1999, the Planning Board reviewed Sprint's application. The Planning Board reviewed a memorandum provided to the Planning Board by John Lynch, AICP, retained by the Planning Board as a land use planning consultant. Mr. Lynch identified certain parts of Sprint's application as incomplete, including Sprint's obligation to demonstrate that existing structures would not be appropriate for use as a communications antenna. In response, Mr. Amin, a Sprint Engineer demonstrated that no such structure was available. Sprint later provided the ZBA with the rest of the information required to complete Sprint's application. At the conclusion of the Planning Board's meeting, the Planning Board directed that Mr. Lynch's memorandum be forwarded to the ZBA as the Planning Board's report, and suggested that the ZBA consider camouflaging techniques. The usual NIMBY crowd made its presence known by vocal but unreasoned opposition.

On June 7, 1999, the ZBA held a public hearing on Sprint's application. At the hearing, Sprint sought to establish that its Proposed Facility conformed with all applicable requirements, and to arrive at a mutually agreeable solution for the construction of the antenna. The public

5

hearing was continued in June, July, September and November of 1999 and in January, February and April of 2000.

On June 5, 2000, the ZBA issued a "Decision and Findings of Philipstown Zoning Board of Appeals" in which it denied Sprint's application for a special use permit authorizing the construction and operation of a wireless telecommunications facility on the Proposed Site. The Complaint in this action was filed on June 29, 2000, and the Amended Complaint on which the motion before the Court is based was filed on November 21, 2000.

### Discussion

A motion for summary judgment may be granted only if the pleadings, affidavits, and certain other supporting papers show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

In order to encourage the accelerated development of telecommunications technology, Congress enacted the Telecommunications Act of 1996 ("the TCA"). The TCA limits the ability of local zoning authorities to regulate federally licensed wireless facilities by providing, *inter alia*:

> "(iii) Any decision by a State or local government or instrument thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by *substantial evidence* contained in a written record;"
> 47 U.S.C. §332(c)(7)(B) (Emphasis added).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Universal Camera v. NRLB*, 340 U.S. 474, 477 (1951). It is "proof within the whole record of such quality and quantity as to generate conviction in and persuade a fair and detached finder of fact that, from that proof as a premise, a conclusion or ultimate fact may be extracted reasonably probatively and logically." *Sprint Spectrum, LP v. Willoth*, 176 F.3d 630, 646 (2d Cir. 1999). When the Court evaluates whether a decision was based on substantial evidence, the Court must consider the entire record, including evidence opposed to the decision of the town authority. *American Textile Mfrs. Inst., Inc. v.* Donovan, 452 U.S. 490, 523 (1981); *Willoth*, 176 F.3d at 638; *Omnipoint Corporation v. Zoning Hearing Board of Pine Grove Township*, 181 F.3d 403, 408 (3rd Cir.1999) (a Court views the record in its entirety and takes account of evidence unfavorable to the agency's decision.).

In addition to meeting the standards set forth in the TCA, a municipal planning board must evaluate the application in light of the standards set forth in the municipality's zoning law. *See Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999); *Mason v. Zoning Board of Appeals of the Town of Clifton Park*, 72 A.D.2d 889, 422 N.Y.S.2d 166 (3d Dept. 1979). Philipstown has two applicable zoning regulations: 1) the specific special permit standards for a communications antenna, set forth in §175-49.10 of the Philipstown Code, and 2) the general standards applicable to all specially permitted uses, set forth in §175-53 of the Philipstown Code. The ZBA based its denial of Sprint's application on the stated ground that it did not meet the general standards set forth in §175-53 of the Philipstown Code. That section provides, in pertinent part, that the antenna must be in harmony with the character of the neighborhood, must be suitably landscaped and maintained, and that it must not be detrimental to the property values of the neighborhood.

7

The ZBA based its decision that Sprint's application did not meet the standards of §175-53 on several grounds, all of which relate to the aesthetic or assumed economic impact of the antenna. The ZBA found that, even if camouflaged, the "sheer size of the structure will detract from the neighborhood and be out of character from the peaceful and scenic residential area." The ZBA also found that the antenna would be "highly visible from the neighbor's homes as well as some of the surrounding areas," and would have "undue influence on the neighborhood and adjacent properties." "No matter what design is installed there will still be a massive 110 foot structure protruding amongst the residences taking away from the natural beauty and tranquility of the area." Finally, the decision states, "The Board received numerous testimony [sic] by the public supporting the view that values would be affected."

The standard of review of the municipality's decision by this Court is deferential, and prohibits a reviewing court from engaging in fact-finding or supplanting reasonable determinations. *See, e.g., Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999). Nevertheless, it is the responsibility of the Court to ensure that the public interest in facilitating the development of telecommunications technology, as articulated by the TCA, is not defeated by NIMBY concerns. *Id.* at 495; *Wisconsin Cent. Ltd. v. Surface Transp. Bd.*, 112 F.3d 881, 886 (7th Cir.1997)(deferential review does not equate with no review at all. The inquiry still must be thorough and probing). Specific aesthetic concerns set forth as evidence in a written record are a valid ground for consideration in deciding whether to grant a wireless communications facility special permit application. *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 646 (2nd Cir. 1999). However, generalized concern with aesthetics is an insufficient ground

8

upon which to base a denial of a special permit application for a wireless communications facility. *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 496 (2d Cir. 1999).

The issue before this Court is whether the articulated reasons underlying the ZBA's denial of Sprint's special permit application are based on substantial evidence contained in the written record. They are not.

Here, the evidence upon which the ZBA based its decision does not meet the standards set forth in the TCA and case law interpreting that Act. To support its assertion that the communications antennae would affect property values adversely, the ZBA relies on "common sense," the testimony of non-expert residents in the community, and an appraisal by Hubbard Realty Services, Inc. which was commissioned by a Philipstown resident for the purpose, and which opined that the proposed communications antenna would cause property values to decrease by 30%. The Hubbard appraisal was undermined in a later appraisal now in the record, which explains that the 30% deduction was based on an evaluation performed in Southhampton, New York where three antennae were proposed on relatively flat terrain, one 308 feet high, one 233 feet high, and one 150 feet high. The first two of these antennae were for ATT and CATV coverage, respectively, and each had FAA markings and lighting. The third was a radio antenna that would transmit up to 50,000 watts of power. The proposed antenna in this case is only 110 feet high in an area characterized by small hills and valleys. It is amenable to camouflage and is not required to be lighted.

Contrary to these arguments, the record also contains two opinions, one from the

9

Philipstown Board of Assessors and the other from a licensed real estate appraiser retained by Sprint, stating that actual experience with similar wireless facilities within Philipstown and other communities has not supported a conclusion that these antennae have reduced the value of nearby property.

The ZBA also relied on the testimony of residents to support the assertion that the proposed communications antenna would harm the character of the community. This testimony includes concerns that the monopole would be 100 feet from the back porch of one residence. However, the monopole will not be within 150 feet of the boundary of the plot on which its construction is proposed, and surrounding residences are also subject to a 150 foot set-off. Accordingly, these concerns are not supported by the facts contained in the record and further evidence the generalized concern that formed the basis of the denial. The ZBA discounts as "limp" the effect of camouflaging the communications antennae, a technique which reduces the aesthetically contrasting effects of an antenna located in fields and woods, in an ex-urban locale. See affidavit of Judson Siebert, Exh. PP.

As with the property value opinion that the ZBA cites to support its decision, there is information in the record that conflicts with the ZBA's aesthetic evaluation. For example, June 5, 2000, the ZBA issued a finding pursuant to SEQRA[1] stating that "no significant environmental effects are associated with the proposed physical changes to the project site." This finding

---

[1] SEQRA is the New York State Environmental Quality Review Act, N.Y. Envir.Cons.Law § 8-0101, *et seq.* (McKinney's 1997)

contradicts the underlying basis for the ZBA's decision to deny Sprint's special permit application.

Generalized concerns about a potential decrease in property values stemming from the construction of the proposed communications antenna, especially in light of the expert reports contained in this record before the Court, are not adequate to support the conclusion that a special use permit should be denied. *See, e.g., Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 497 (2d Cir. 1999); *Omnipoint Corp. v. Zoning Hearing Bd.*, 20 F.Supp.2d 875, 880 (E.D.Pa.1998) (holding that "unsubstantiated personal opinions" of twelve residents expressing "generalized concerns ... about aesthetic and visual impacts on the neighborhood do not amount to substantial evidence"); *Telecorp Realty v. Town of Edgartown*, 81 F.Supp.2d 257, 260 (D.Mass.2000) (Tauro, J.) (the generalized concerns of a few residents about the aesthetic impact of a proposed antenna does not amount to substantial evidence); *BellSouth Mobility v. Gwinnett County*, 944 F.Supp. 923, 926 (N.D.Ga.1996)(aesthetic concerns expressed by one person who spoke for all the members of his subdivision, including twenty property owners who could see the proposed pole from their front window, is not substantial evidence).

Nor can it be that because a communications antenna is set in a residential district and is visible to the surrounding homes, that it is therefore in all events adverse to the harmony and character of the neighborhood, to an extent sufficient to support a decision to deny a special permit for construction of such an antenna. The Philipstown Town Code itself contemplates construction of a communication antenna in residential zones, including zones R-10, R-20, R-40,

11

R-80 and R-120. §175-49.10 (B)(4). Mobile cell phones are an essential to modern life and they are impractical if the users move in and out of gaps in land coverage. Defendants did not come forth with a better site; a response typical of NIMBY resistance to change. To permit such a decision to stand would be contrary to the purpose of the TCA, which was intended to counter such arguments in order to facilitate the nationwide development of telecommunications technology. *See, e.g. Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 497 (2d Cir. 1999).

The evidence relied on by the ZBA is precisely the sort of generalized aesthetic concern that is an impermissible basis on which to deny a special permit for a communications antenna. *See, e.g., Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 496 (2d Cir. 1999). Considering the entire record, including evidence in opposition to the decision of the ZBA, it is clear to the Court that the decision of the ZBA does not conform with the requirements of the TCA. There is not substantial evidence in the written record to support the decision of the ZBA.

Plaintiff's motion is granted. Defendants' motion is denied. A final judgment shall issue which shall direct the ZBA to issue forthwith a special permit to Sprint for the purpose of constructing an antenna and appurtenances as required at 1924 Route 9, Town of Philipstown, New York. The Building Inspector of the Town of Philipstown and the Town of Philipstown are directed to issue a building permit and all necessary ancillary permits necessary to build and operate the facility. Sprint is directed to employ reasonable camouflage techniques used elsewhere in the industry that the Building Inspector or the ZBA may demand in order to

minimize the visual impact of the antenna.

Settle a proposed final judgment on five (5) days notice or waiver of notice.

SO ORDERED.

Dated: White Plains, New York
January 25, 2001

_Charles Brieant_
Charles L. Brieant, U.S.D.J.